RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0280p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

TAMARIN LINDENBERG, individually and as natural guardian of her minor children ZTL and SML,

*Plaintiff-Appellee/Cross-Appellant*,

*v.*

JACKSON NATIONAL LIFE INSURANCE COMPANY,

*Defendant-Appellant/Cross-Appellee*,

STATE OF TENNESSEE,

*Intervenor-Appellee*.

Nos. 17-6034/6079

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:13-cv-02657—Jon Phipps McCalla, District Judge.

Argued: May 3, 2018

Decided and Filed: December 21, 2018

Before: CLAY, STRANCH, and LARSEN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Gadson W. Perry, BUTLER SNOW LLP, Memphis, Tennessee, for Appellant/Cross-Appellee. Molly A. Glover, BURCH, PORTER & JOHNSON, PLLC, Memphis, Tennessee, for Appellee/Cross-Appellant. Joseph Ahillen, OFFICE OF THE ATTORNEY GENERAL OF TENNESSEE, Nashville, Tennessee, for Intervenor Appellee. **ON BRIEF:** Gadson W. Perry, Daniel W. Van Horn, Michael C. McLaren, BUTLER SNOW LLP, Memphis, Tennessee, for Appellant/Cross-Appellee. Molly A. Glover, Charles S. Higgins, BURCH, PORTER & JOHNSON, PLLC, Memphis, Tennessee, for Appellee/Cross-Appellant. Joseph Ahillen, OFFICE OF THE ATTORNEY GENERAL OF TENNESSEE, Nashville, Tennessee, for Intervenor Appellee.

CLAY, J., delivered the opinion of the court in which STRANCH, J., joined, and LARSEN, J., joined in part.  LARSEN, J. (pp. 26–47), delivered a separate opinion concurring in part and dissenting in part.

―――――――――――

**OPINION**

―――――――――――

CLAY, Circuit Judge.   Defendant Jackson National Life Insurance Company ("Defendant") appeals from the district court's judgment enforcing a jury trial verdict of $350,000 in actual damages, $87,500 in bad faith damages, and $3,000,000 in punitive damages in favor of Plaintiff Tamarin Lindenberg ("Plaintiff"), individually and in her capacity as natural guardian of her minor children, ZTL and SML.[1]  Plaintiff cross-appeals, challenging a statutory cap that the district court applied to reduce the award of punitive damages to $700,000.  The State of Tennessee ("the State") intervened to defend the statute.  For the reasons that follow, we **AFFIRM** the district court's judgment on all issues raised in Defendant's appeal, **REVERSE** on the issue raised in Plaintiff's cross-appeal, **VACATE** the judgment as to punitive damages, and **REMAND** with instructions for the district court to recalculate the award of punitive damages in accordance with the jury verdict and with this Court's holding that the statutory cap on punitive damages, T.C.A. § 29-39-104, is unconstitutional.

**BACKGROUND**

This case arises in diversity and concerns a dispute over a $350,000 life insurance policy issued by Defendant to Thomas A. Lindenberg ("Decedent").  Plaintiff Tamarin Lindenberg, the former wife of Decedent, brought suit individually and in her capacity as the natural guardian of her minor children, ZTL and SML, the two children of Plaintiff and Decedent.  Plaintiff's claims included breach of contract and both statutory and common law bad faith.

Plaintiff is the primary beneficiary designated in the life insurance policy at issue (the "Policy") and was to receive 100% of the proceeds of the Policy upon Decedent's death.  The

---

[1]During the pendency of this lawsuit, Plaintiff's minor child ZTL joined the suit as co-plaintiff after reaching the age of majority.  Because this change was otherwise immaterial to the proceedings, we refer in this opinion to the parties as they were represented in the original complaint.

contingent beneficiaries of the Policy are Decedent's "surviving children equally." (R. 125 at PageID #1854.)  During their marriage, Plaintiff and decedent adopted ZTL and SML.  Third-Party Defendant Mary Angela Williams ("Williams") is Decedent's daughter from a prior marriage.

Plaintiff and Decedent executed a Marital Dissolution Agreement ("MDA") in 2005, and a divorce decree was issued in 2006.  The MDA required that "Wife shall pay for the Life Insurance premium for the Columbus and [Defendant] policies for so long as she is able to do so and still support the parties['] children."  (Trial Ex. 10 at 7.)  Additionally, the MDA required "Husband at his expense [to] maintain in full force insurance on his life having death benefits payable to the parties' children as irrevocable primary beneficiaries[.]"  (*Id.* at 9.)

Decedent died on January 22, 2013.  On February 6, 2013, Plaintiff filed a claim under the Policy for the death benefit.  On March 11, 2013, Plaintiff's attorney sent Defendant a letter seeking expedited review of the claim and payment of the death benefit.  On March 22, 2013, Defendant responded with a letter requiring further action by Plaintiff, including obtaining "waivers to be signed by the other potential parties" and "court-appointed Guardian(s) for the Estates of the two minor children."  (Trial Ex. 23.)  Defendant stated that another option would be for Plaintiff to waive her rights to the claim so that Defendant could disburse the proceeds to the minor children.  Throughout the month of May 2013, Plaintiff and Defendant were in communication about how to proceed and whether Defendant would interplead the funds with the court.  This discussion culminated in Plaintiff filing the instant lawsuit.

With its answer, Defendant included an interpleader complaint that implicated Plaintiff and Williams.  Defendant later maintained that its interpleader complaint also implicated the minor children, ZTL and SML.[2]  Defendant asserted that it was "not in a position to determine,

---

[2]When Plaintiff filed her original claim on the Policy, Defendant insisted that Plaintiff must obtain waivers from Decedent's children before the Death Benefit could be distributed.  (*See, e.g.*, R. 1-1 at PageID #9–10 (describing March 22, 2013, letter from Defendant to Plaintiff demanding "waivers for the minor children" and "other children").)  However, Defendant's interpleader complaint did not clearly implicate the minor children, alleging only that Williams had an "actual or potential claim[]."  (R. 4 at PageID #87 ¶ 20.)  Defendant later characterized its complaint as implicating the minor children when it opposed Plaintiff's motion to dismiss the interpleader complaint.  (*See* R. 27 at PageID #195 ("[Defendant] has at all times during the course of this litigation contended that interpleader is appropriate because [Defendant] is or may be exposed to multiple liabilities given the actual or potential claims of [Plaintiff], *her minor children*, and/or Ms. Williams.") (emphasis in original).)

factually or legally, who is entitled to the Death Benefit," and requested that the district court "determine to whom said benefits should be paid." (R. 4 at 7.)

Plaintiff and Williams jointly moved to dismiss the interpleader complaint. While the motion was pending, and after several months of litigation, the parties filed a joint motion to appoint *guardians ad litem* for the minor children, which the district court granted. The court then granted the motion to dismiss Defendant's interpleader complaint. The court further ordered Defendant "to disburse life insurance policy benefits to Plaintiff in the amount of $350,000 with interest from January 23, 2013, until the date of payment." (R. 32 at 17.) Plaintiff's claims against Defendant remained.

Defendant filed a motion to dismiss, attacking Plaintiff's claims for punitive damages and bad faith. Through a series of orders, the court granted in part and denied in part Defendant's motion. The court dismissed Plaintiff's claims for common law bad faith. The court allowed Plaintiff to proceed with her claims for common law breach of contract, statutory bad faith, and common law punitive damages predicated on breach of contract.

Following discovery, Defendant filed for summary judgment. The district court denied the motion on all claims Plaintiff asserted in her personal capacity but granted the motion on all claims Plaintiff asserted on behalf of the minor children, ZTL and SML. The court held a weeklong trial. Defendant moved for judgment as a matter of law, which the district court denied. The jury returned a verdict finding that (1) Defendant breached its contract with Plaintiff, resulting in actual damages in the amount of $350,000; (2) Defendant's refusal to pay was in bad faith, resulting in additional damages in the amount of $87,500; and (3) Defendant's refusal to pay was either intentional, reckless, malicious, or fraudulent. The jury then returned a special verdict awarding Plaintiff punitive damages in the amount of $3,000,000. Defendant renewed its motion for judgment as a matter of law.

Defendant also argued that the district court must apply T.C.A. § 29-39-104, a Tennessee statute that caps punitive damages at two times the amount of compensatory damages awarded or $500,000, whichever is greater. In response, Plaintiff argued that the statutory punitive damages cap violates the Tennessee Constitution. On this basis, Plaintiff filed a motion to certify the issue

of the punitive damages cap's constitutionality to the Tennessee Supreme Court. The State of Tennessee then moved to intervene, which the district court permitted. The district court agreed to certify the following two questions to the Tennessee Supreme Court:

> 1. Do the punitive damages caps in civil cases imposed by Tennessee Code Annotated Section 29-39-104 violate a plaintiff's right to a trial by jury, as guaranteed in Article I, section 6 of the Tennessee Constitution?
>
> 2. Do the punitive damages caps in civil cases imposed by Tennessee Code Annotated Section 29-39-104 represent an impermissible encroachment by the legislature on the powers vested exclusively in the judiciary, thereby violating the separation of powers provisions of the Tennessee Constitution?

(R. 188 at PageID # 4270.) The Tennessee Supreme Court recognized that the "certified questions raise issues of first impression not previously addressed by the appellate courts of Tennessee" but declined to provide an opinion on either of the certified questions. (R. 209-1 at PageID #4916.)

The district court then rejected Defendant's renewed motion for judgment as a matter of law, rejected Plaintiff's constitutional challenge to the punitive damages cap, and entered judgment. In doing so, the court applied the statutory punitive damages cap to reduce Defendant's liability for punitive damages from $3,000,000 to $700,000. The parties filed timely cross-appeals.

## DISCUSSION

The parties challenge multiple aspects of the proceedings below. Defendant argues that the district court erred by dismissing its interpleader complaint, failing to dismiss Plaintiff's punitive damages claim, and failing to grant its motion for judgment as a matter of law. Meanwhile, Plaintiff argues that the statutory punitive damages cap, T.C.A. § 29-39-104, violates the Tennessee Constitution. We address Defendant's three arguments before turning to Plaintiff's argument.

### A. Dismissal of Defendant's Interpleader Complaint

Defendant first argues that the district court erred when it dismissed Defendant's interpleader complaint. "Interpleader is an equitable proceeding that 'affords a party who fears

being exposed to the vexation of defending multiple claims to a limited fund or property that is under his control a procedure to settle the controversy and satisfy his obligation in a single proceeding.'" *United States v. High Tech. Prods., Inc.*, 497 F.3d 637, 641 (6th Cir. 2007) (quoting 7 Charles Alan Wright, et al., Federal Practice and Procedure § 1704 (3d ed. 2001)). Interpleader may be invoked either via Rule 22 of the Federal Rules of Civil Procedure ("rule interpleader") or via 28 U.S.C. § 1335 ("statutory interpleader"). In this case, Defendant attempted to invoke statutory interpleader.

"An interpleader action typically proceeds in two stages." *High Tech. Prods.*, 497 F.3d at 641. "During the first stage, the court determines whether the stakeholder has properly invoked interpleader . . . ." *Id.* In order to properly invoke statutory interpleader, a stakeholder must satisfy the statutory jurisdictional requirements by properly pleading: (1) the existence of actual or potential conflicting claims to a limited fund or property held by the stakeholder, 28 U.S.C. § 1335(a); *see High Tech. Prods.*, 497 F.3d at 642; (2) an amount in controversy of at least $500, 28 U.S.C. § 1335(a); and (3) minimal diversity among the competing claimants. *Id.*; *see State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 530–31 (1967). "During the second stage, the court determines the respective rights of the claimants to the fund or property at stake via normal litigation processes, including pleading, discovery, motions, and trial." *High Tech Prods.*, 497 F.3d at 641.

In this case, Defendant does not challenge the district court's dismissal of its interpleader complaint on the merits. Instead, Defendant asserts that the dismissal must be reversed because the district court improperly relied on extrinsic evidence that "the guardians ad litem of the minor children ha[d] waived any claim the remaining contingent beneficiaries—ZTAL and SML—may have to the benefits." (First Br. at 27.) We need not reach this issue, however, because Defendant did not raise it below. *See United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009) (holding that an argument is preserved if a litigant (1) states "the issue with sufficient clarity to give the court and opposing parties notice that it is asserting the issue" and (2) provides "some minimal level of argumentation in support of it").

In fact, rather than challenging the waivers as extrinsic evidence, Defendant invited the district court to consider the waivers. Defendant discussed the waivers at length in its opposition to Plaintiff's motion to dismiss, arguing that the waivers were inadequate for substantive reasons:

> The Court should likewise reject [Plaintiff]'s contention that [Defendant]'s refusal to distribute the benefits is improper in light of the affidavits and waivers that have been submitted on behalf of the minor children. Though the appointed guardians have submitted their own affidavits and waivers on behalf of the minor children, these "reports" have not been approved by the Court as required by statute. Thus, because [Defendant] is not aware of any authority that would confer the guardians with the inherent and independent ability to lawfully waive the minor children's rights to the benefits, [Defendant] cannot disburse the benefits directly to [Plaintiff] without further approval from this Court. Accordingly, [Defendant] respectfully requests permission to interplead the life insurance benefits and that it be relieved from further liability with respect to this matter because [Defendant] has pled sufficient facts evidencing "two or more" potential adverse claims to the benefits.

(R. 27 at PageID #195–96; *see also id.* at PageID #204–06.) Furthermore, Defendant specifically asked the district court to dismiss its interpleader complaint if the court found the waivers to be valid:

> Alternatively, if the Court finds that the best interests of the minor children have been served and that . . . the minor children have lawfully waived any potential claim to the life insurance benefits, [Defendant] requests that the Court exercise its discretion under Tennessee Code Ann. § 34-1-121 to approve [Defendant]'s disbursement of the life insurance proceeds to [Plaintiff] and dismiss its action for interpleader because all of the potentially adverse interests have been waived.

(R. 27 at PageID #196.) We decline to consider Defendant's complaints about an analysis and an outcome that Defendant itself requested. *See United States v. Hanna*, 661 F.3d 271, 293 (6th Cir. 2011) (holding that an invited error does not warrant reversal).

### B. Plaintiff's Punitive Damages Claim

Defendant next argues that the district court should have dismissed Plaintiff's claim for punitive damages in its entirety rather than allowing the claim to proceed to the extent that it was based on breach of contract. This Court reviews *de novo* the district court's dismissal of a complaint for failure to state a claim. *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007). We must accept the factual allegations in the complaint as

true and construe the complaint in the light most favorable to the plaintiff. *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005).

Defendant argues that the district court's denial of its motion to dismiss runs afoul of this Court's decision in *Heil Co. v. Evanston Insurance Co.*, 690 F.3d 722 (6th Cir. 2012). In *Heil*, an insurer refused to defend Heil for the first two years of a wrongful death suit before eventually taking over the defense. *Id.* at 726. Heil then sued for breach of contract due to the failure to pay attorney fees, violation of the bad faith statute, and bad faith failure to settle. *Id.* A jury found in Heil's favor on the first two of the three claims and awarded punitive damages. *Id.* This court found clear error, holding that the statutory remedy for bad faith is the "exclusive extracontractual remedy for an insurer's bad faith refusal to pay on a policy." *Id.* at 728. Therefore, under *Heil*, punitive damages—whether predicated on bad faith, breach of contract, or any other type of claim—may not be awarded in a case involving an insurer's bad faith refusal to pay. *Id.*

If *Heil* remains good law—which Plaintiff disputes—then the district court should have dismissed Plaintiff's claim for punitive damages in its entirety. Defendant invokes the general rule that, "[a] panel of this Court cannot overrule the decision of another panel." *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). But this rule "is not absolute." *Hampton v. United States*, 191 F.3d 695, 701 (6th Cir. 1999). An inconsistent decision from the Supreme Court or from this Court sitting en banc "overrules the prior decision." *Salmi*, 774 F.2d at 689 (quoting *Gist*, 736 F.2d at 357–58). Similarly, an interpretation of Tennessee law applied by one panel of this Court is not binding on future panels where there has been "an indication from the Tennessee courts that they would have decided [the prior decision] differently." *Hampton*, 191 F.3d at 701 (alteration in original) (quoting *Blaine Constr. Corp. v. Ins. Co. of N. Am.*, 171 F.3d 343, 350–51 (6th Cir. 1999)). In *Hampton*, we found that a single decision of a state court of appeals may abrogate this Court's interpretation of state law, at least in circumstances where (1) state law treats an appellate court decision as controlling in the absence of a ruling from the state supreme court; (2) there is no indication from the state supreme court that it would reach a different outcome; and (3) the state appellate court's decision is

irreconcilable with our own ruling.  *See id.* at 702 (quoting *Wieczorek v. Volkswagenwerk, A.G.*, 731 F.2d 309, 310 (6th Cir. 1984) and citing *Hicks v. Feiock*, 485 U.S. 624, 630 n. 3 (1988)).

Our review of Tennessee caselaw reveals that the Tennessee Court of Appeals has abrogated *Heil*'s pronouncement that the statutory remedy for bad faith is the "exclusive extracontractual remedy for an insurer's bad faith refusal to pay on a policy."  690 F.3d at 728. In *Riad v. Erie Insurance Exchange*, the defendant relied on *Heil* to argue that the plaintiff "was not entitled to damages beyond those contemplated in" the bad faith statute and so could not recover punitive damages.  436 S.W.3d 256, 275 (Tenn. Ct. App. 2013), *perm. app. denied* (Tenn. 2014).  The appellate court rejected this contention, stating:

> we reaffirm our conclusion that Plaintiff was entitled to recover any damages applicable in breach of contract actions and was not statutorily limited to the recovery of the insured loss and the bad faith penalty.  Punitive damages, while generally not available in a breach of contract case, may be awarded in a breach of contract action under certain circumstances.  To recover punitive damages, the trier of fact must find that a defendant acted either intentionally, fraudulently, maliciously, or recklessly.  Erie does not argue that the jury was improperly instructed or that the jury failed to consider the applicable factors.  Accordingly, we further conclude that the issue of punitive damages was properly submitted to the jury.

*Id.* at 276 (citations and internal quotation marks omitted).  Most relevant for our purposes, *Riad* specifically quoted and disclaimed *Heil*'s statement that the bad faith statute is an exclusive remedy, explaining that it "ignores the *Myint* progeny of cases . . . ."  *Id.*  Indeed, *Myint*—which *Heil* never mentioned, even though *Myint* was decided before *Heil* and after the unpublished cases that *Heil* relied upon—is irreconcilable with *Heil*'s holding that the bad faith statute provides an exclusive remedy.  In *Myint*, the Tennessee Supreme Court held exactly the opposite, concluding that "nothing in . . . the bad faith statute . . . limits an insured's remedies to those provided therein."  *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 925 (Tenn. 1998).

A published opinion of the Tennessee Court of Appeals is "controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction."  Tenn. Sup. Ct. R. 4(G)(2); *see* Court of Appeals Precedent, Tenn. Op. Att'y Gen. No. 07-98, 2007 WL 2221359 (July 3, 2007) (explaining rule's application to published opinions of Tennessee Court of Appeals).  We find no indication that the Tennessee Supreme Court

disagrees with *Riad*, which is a published case.**3**  *See* Tenn. Sup. Ct. R. 4(A)(1) (explaining that a "published" case is one that is published in the Southwestern Reporter).  As in *Hampton*, then, a state appellate court in this case has abrogated this Court's interpretation of state law.  *See Hampton*, 191 F.3d at 702 ("[T]he Michigan Court of Appeals decision in *Froede* controls and, until or unless the Michigan Supreme Court decides otherwise, or in some other way casts sufficient doubt on that decision, we must abandon our interpretation of Michigan law . . . .").  We find that *Heil* is no longer good law to the extent that it held that the statutory remedy for bad faith is the "exclusive extracontractual remedy for an insurer's bad faith refusal to pay on a policy."  690 F.3d at 728.  The law in Tennessee now provides that the statutory remedy for bad faith is the exclusive *statutory* remedy for an insurer's bad faith refusal to pay on a policy, but a plaintiff may freely pursue common law claims and remedies alongside a statutory bad faith claim.**4**  *See Riad*, 436 S.W.3d at 276; T.C.A. § 56-8-113.  Accordingly, we reject Defendant's argument that *Heil* requires us to reverse the district court's ruling.

Defendant challenges this conclusion for two reasons, neither of which is persuasive.  *First*, Defendant argues that *Riad* and *Myint* are limited to cases involving tortious or quasi-tortious acts because both cases involved claims under the Tennessee Consumer Protection Act ("TCPA"), T.C.A. §§ 47-18-101, *et seq.*  But although both cases indeed involved TCPA and breach-of-contract claims, neither court's underlying analysis of the bad faith statute was concerned with the nature of the plaintiff's related claims.  The *Myint* court looked to the text of the bad faith statute to conclude that "nothing in . . . the bad faith statute . . . limits an insured's remedies to those provided therein."  970 S.W.2d at 925.  Applying this rule to the case before it, the court concluded that the plaintiff could assert a TCPA claim alongside a bad faith claim; only then did the court find that the TCPA claim failed on the merits.  *Id.* at 926.  Meanwhile, when the *Riad* court discussed punitive damages, it did not link the availability of such damages to the

---

**3**The dissent draws a contrary conclusion, relying on language in the Tennessee Supreme Court's order refusing certification in this case.  An unpublished order, however, is not binding or precedential and cannot "reverse[] or modif[y]" a decision in the manner contemplated by Rule 4(G)(2).  When the high court disagrees with a decision, the normal procedure is to allow the case to be appealed and then reverse it.  In *Riad*, the Tennessee Supreme Court denied permission to appeal.  *See Riad v. Erie Ins. Exch.*, No. E2013-00288-SC-R11-CV, 2014 Tenn. LEXIS 196 (Mar. 4, 2014).

**4**This statement of law incorporates the Court's discussion of T.C.A. § 56-8-113, *infra*.

existence of any particular type of claim, such as a TCPA claim; instead, the court merely required that the "defendant acted either intentionally, fraudulently, maliciously, or recklessly." 436 S.W.3d at 276. Accordingly, Defendant is incorrect that *Myint* and *Riad* are limited to cases involving tortious or quasi-tortious acts.

*Second*, Defendant argues that we should apply *Heil* because the Tennessee General Assembly overruled the *Myint* line of cases with a 2011 statutory amendment, codified as T.C.A. § 56-8-113. The statute provides:

> Notwithstanding any other law, title 50 [employment] and this title shall provide the sole and exclusive statutory remedies and sanctions applicable to an insurer . . . for alleged breach of, or for alleged unfair or deceptive acts or practices in connection with, a contract of insurance . . . . Nothing in this section shall be construed to eliminate or otherwise affect any . . . [r]emedy, cause of action, right to relief or sanction available under common law.

T.C.A. § 56-8-113. We disagree with Defendant's argument, finding that § 56-8-113 overrules *Myint* only in part, and only in a manner not relevant here. Under § 56-8-113, a plaintiff who asserts a bad faith claim may not recover *statutory* damages beyond those set forth in the bad faith statute and the title relating to employment. But § 56-8-113 leaves intact *Myint*'s underlying conclusion that nothing in the bad faith statute itself "limits an insured's remedies to those provided therein[,]" 970 S.W.2d at 925, and the new statute expressly disclaims any effect on the availability of common law remedies like punitive damages: "Nothing in this section shall be construed to eliminate or otherwise affect any . . . [r]emedy, cause of action, right to relief or sanction available under common law[.]" T.C.A. § 56-8-113. Accordingly, the new statute has no effect on *Riad*'s conclusion that "[p]unitive damages, while generally not available in a breach of contract case, may be awarded in a breach of contract action under certain circumstances." 436 S.W.3d at 276 (citations and internal quotation marks omitted). Defendant's argument is incorrect, and we affirm the district court's denial of Defendant's motion to dismiss Plaintiff's punitive damages claim for breach of contract.

### C. Defendant's Motion for Judgment as a Matter of Law

Defendant next challenges the district court's denial of its motion for judgment as a matter of law. "We review *de novo* a district court's denial of a motion for judgment as a matter

of law under Federal Rule of Civil Procedure 50(b)." *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 804 (6th Cir. 2015) (citing *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005)). "In this Circuit, a federal court sitting in diversity must apply the standard for judgments as a matter of law of the state whose substantive law governs." *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 468 (6th Cir. 1996).

> Under Tennessee law, the reviewing court must "take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusions to be draw[n] from the whole evidence."

*Stinson v. Crye-Leike, Inc.*, 198 F. App'x 512, 515 (6th Cir. 2006) (alteration in original) (quoting *Arms v. State Farm Fire & Cas. Co.*, 731 F.2d 1245, 1248 (6th Cir. 1984)). Judgment as a matter of law should be granted "only if reasonable minds could draw but one conclusion." *Sauls v. Evans*, 635 S.W.2d 377, 379 (Tenn. 1982).

Defendant asserts that the district court should have granted its motion for judgment as a matter of law regarding Plaintiff's claims for (1) statutory bad faith and (2) punitive damages predicated on breach of contract. We address the two issues in turn.

### 1. Statutory Bad Faith Claim

Tennessee's bad faith statute for insurers states the following:

> The insurance companies of this state, and foreign insurance companies and other persons or corporations doing an insurance or fidelity bonding business in this state, in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest on the bond, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that the failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond[.]

T.C.A. § 56-7-105(a). In order to prevail on a § 56-7-105 bad faith claim, a plaintiff must prove four elements:

(1) the policy of insurance must, by its terms, have become due and payable, (2) a formal demand for payment must have been made, (3) the insured must have waited 60 days after making his demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days), and (4) the refusal to pay must not have been in good faith.

*Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986).

Defendant baldly asserts that it was entitled to judgment as a matter of law on Plaintiff's bad faith claim because of "the lack of evidence in support of [Plaintiff]'s bad-faith . . . claim[]." (First Br. 34.)  However, Defendant provides no support for this assertion in its principal brief, which suggests that Defendant waived this issue. *See United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (citation omitted)).

In any event, Defendant's argument fails on the merits.  In its reply brief, Defendant is more specific, invoking the uncertainty defense to claims of bad faith.  An insurer "is entitled to rely upon available defenses and refuse payment if there [are] substantial legal grounds that the policy does not afford coverage for the alleged loss." *Ginn v. Am. Heritage Life Ins. Co.*, 173 S.W.3d 433, 443 (Tenn. Ct. App. 2004) (citation omitted).  Thus, the statute bars the imposition of a bad faith penalty where (1) an insurer's refusal to pay is based on the insurer's uncertainty about the true beneficiary or beneficiaries of a policy, and (2) the insurer's uncertainty is supported by a substantial legal ground. *See Nelms v. Tenn. Farmers Mut. Ins. Co.*, 613 S.W.2d 481, 484 (Tenn. Ct. App. 1978).  This holds true even if a court ultimately finds that the claimant is entitled to the proceeds of the policy. *See id.*  A plaintiff who wishes to overcome the uncertainty defense generally "must demonstrate 'there were no legitimate grounds for disagreement about the coverage of the insurance policy.'" *Fulton Bellows, LLC v. Fed. Ins. Co.*, 662 F. Supp. 2d 976, 996 (E.D. Tenn. 2009) (quoting *Zientek v. State Farm Int'l Servs.*, No. 1:05-cv-326, 2006 WL 925063, *4 (E.D. Tenn. Apr. 10, 2006)).  As always, a plaintiff may also challenge the factual support for a defendant's proffered affirmative defense. *See Ass'n of Owners of Regency Park Condominiums v. Thomasson*, 878 S.W.2d 560, 566 (Tenn. Ct. App. 1994) ("For an affirmative defense, which is affirmatively pleaded, the burden is on the pleader to prove same.") (quoting 11 Tenn. Jur. Evidence § 50 (1984)).

Defendant argues that it was entitled to judgment as a matter of law because it was "concerned about the prospect of multiple liabilities" when it refused to pay Plaintiff's claim. (Third Br. 31.) This concern, Defendant argues, arose from the fact that the MDA between Plaintiff and Decedent rendered the Policy's primary beneficiary "ambiguous and uncertain." (*Id.*) In support of this uncertainty, Defendant cites *Holt v. Holt*, 995 S.W.2d 68, 72 (Tenn. 1999), a case that Defendant characterizes as standing for the proposition that "the MDA . . . vested the children with 'an equitable interest' in the policy at issue here, . . . and that equitable interest created potential adversity between the children and [Plaintiff]." (Third Br. 31.)

Applying Tennessee's standard of review, however, we find that reasonable minds could reject Defendant's argument because it is not clear that *Holt* was the actual reason that Defendant refused to pay Plaintiff's claim.[5] Indeed, reasonable minds could instead conclude that Defendant raised the uncertainty defense during litigation as a mere *post hoc* explanation for its conduct. When Defendant initially filed its interpleader complaint, the only potential adverse claim it described was that of Williams—not of the minor children. Defendant also did not mention in its complaint its supposed uncertainty about whether the minor children had an equitable interest in the policy. And furthermore, Defendant did not even mention *Holt*—the supposed basis for its uncertainty—in its motion to dismiss Plaintiff's complaint.

Prior to its motion to dismiss, Defendant's refusal to pay had no apparent basis under the law. Indeed, Defendant did not seem to understand—and certainly did not convey—what Plaintiff could do to fulfill Defendant's demand for waivers from other potential claimants. Trial witnesses testified that the guardianship process Defendant suggested for obtaining waivers was complicated, uncommon, and unnecessary. Defendant's staff admitted that it did not "meticulously review" the letter it sent to Plaintiff in which it demanded the waivers. (R. 184 at PageID #3308.) And immediately after sending the letter, the employee who wrote it closed the file on Plaintiff's complaint. Defendant's purported uncertainty is not consistent with its actions to stymie Plaintiff's claim under the Policy: Defendant initially refused to consider as proposed guardians the very same individuals whom it would later jointly move the district court to

---

[5]Because there is reason to believe that Defendant did not rely on *Holt* in good faith, we need not decide whether good-faith reliance on *Holt* could support a refusal to pay in the future under analogous circumstances.

appoint to that role, Defendant repeatedly stated that it would send waiver forms but never did, and Defendant refused to consider Plaintiff's proposed alternative solution in the form of a hold harmless and indemnification agreement.  In light of this evidence, a reasonable juror could conclude that Defendant did not actually refuse to pay the claim because of the legal uncertainty created by *Holt*.

### 2. Punitive Damages Claim Predicated on Breach of Contract

Defendant next argues that it was entitled to judgment as a matter of law on Plaintiff's claim for punitive damages arising from breach of contract.  "Punitive damages are intended to punish the defendant for wrongful conduct and to deter others from similar conduct in the future." *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 445 (Tenn. 1984) (citing *Liberty Mut. Ins. Co. v. Stevenson*, 368 S.W.2d 760 (Tenn. 1963)); *see Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 292 (1989) ("Damages are designed not only as a satisfaction to the injured person, but likewise as punishment to the guilty, to deter from any such proceeding for the future and as a proof of the detestation of the jury to the action itself.") (quoting *Wilkes v. Wood*, Lofft. 1, 18–19, 98 Eng. Rep. 489, 498–499 (K.B. 1763)).

Punitive damages may be awarded in "egregious" cases involving breach of contract where, in addition to showing that the defendant breached a contract, the plaintiff provides "clear and convincing proof that the defendant has acted either 'intentionally, fraudulently, maliciously, or recklessly.'" *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211 n.14 (Tenn. 2012) (quoting *Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175, 187 (Tenn. 2009)).  For proof to be clear and convincing, there must be "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3. (Tenn. 1992).  The Supreme Court of Tennessee summarizes the four levels of intent that are capable of giving rise to punitive damages for a breach of contract as follows:

> A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation. A person acts maliciously when the person is motivated by ill will, hatred, or

personal spite. A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.

*Id.* at 901 (citations omitted).

In this case, the jury faced the question of whether Defendant's breach of contract involved egregious conduct. As previously discussed, reasonable minds could find that Defendant's uncertainty defense was merely a *post hoc* explanation for its refusal to pay on the Policy. Based on the following evidence, reasonable minds could go further, finding that clear and convincing evidence demonstrated that Defendant's refusal to pay was at least reckless.

Defendant was aware that its refusal to pay could lead to litigation between multiple parties; indeed, Defendant threatened to pursue such litigation itself through an interpleader action, and ultimately did so. Litigation inflicts substantial costs, both on the public and on the parties involved, and reasonable minds could conclude that Defendant consciously disregarded a risk that its threats—and eventual imposition—of litigation was unjustifiable. The jury learned that Defendant misled Plaintiff about her legal rights, incorrectly asserting that she had "obviously waived her beneficiary status" under the Policy. (R. 185 at PageID #3865.) The jury also learned that Defendant provided no basis for this bald assertion and that Defendant's systems to prevent its personnel from making false and unsupported assertions of law were inadequate. The jury further learned that when Plaintiff complained about the cost and confusion of Defendant's seemingly unjustified threat of an interpleader action, Defendant told her, "that is not our problem." (R. 182 at PageID #2799.) Indeed, Defendant told the jury that it had no policy or standard operating procedure in place to guide Plaintiff's claim to resolution without litigation, and its staff was merely dedicated to "closing" Plaintiff's complaints. (R. 184 at PageID # 3268; R. 185 at PageID #3873.)

In light of this evidence, reasonable minds could have concluded that clear and convincing evidence showed that Defendant's pursuit of litigation with Plaintiff was at least reckless. *See Hodges*, 833 S.W.2d at 901. We therefore affirm the district court's denial of Defendant's motion for judgment as a matter of law.

## D. The Statutory Cap on Punitive Damages

On cross-appeal, Plaintiff argues that the statutory punitive damages cap, T.C.A. § 29-39-104,[6] which the district court applied below, violates two provisions of the Tennessee Constitution:  the individual right to a jury trial and the doctrine of separation of powers.  This Court reviews *de novo* a district court's interpretation of state law.  *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991).  Faithful application of a state's law requires us to "anticipate how the relevant state's highest court would rule in the case," and in doing so we are "bound by controlling decisions of that court."  *In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005).  Where, as here, the state's appellate courts have not addressed the issue presented, "we must predict how the [state's highest] court would rule by looking to all the available data." *Allstate Ins. Co. v. Thrifty Rent–A–Car Sys. Inc.*, 249 F.3d 450, 454 (6th Cir. 2001).  Federal courts should be "extremely cautious about adopting 'substantive innovation' in state law." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 578 (6th Cir. 2004) (citation omitted).  When facing state constitutional challenges, Tennessee statutes receive "a strong presumption" of constitutionality. *Lynch v. City of Jellico*, 205 S.W.3d 384, 390 (Tenn. 2006) (citing *Osborn v. Marr*, 127 S.W.3d 737, 740–41 (Tenn. 2004)); *see also Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009) ("Our charge is to uphold the constitutionality of a statute wherever possible.").

Upon our assessment of Tennessee law, we find that the punitive damages bar set forth in § 29-39-104 violates the individual right to a trial by jury set forth in the Tennessee Constitution. The Declaration of Rights in the Tennessee Constitution provides that "the right of trial by jury shall remain inviolate . . . ."  Tenn. Const. art. I, § 6.  This broad language does not guarantee the right to a jury trial in every case.  "Rather, it guarantees the right to trial by jury as it existed at

---

[6]In relevant part, T.C.A. § 29-39-104(a)(5) provides that punitive damages are limited to the greater of either double "the total amount of compensatory damages awarded" or $500,000.  The limitation "shall not be disclosed to the jury, but shall be applied by the court to any punitive damages verdict[.]"  *Id.* § 29-39-104(a)(6). The limitation does not apply in any suit involving intent to inflict serious physical injury, intentional falsification or concealment of records, injuries or death caused by an intoxicated defendant, or felonious conduct.  *Id.* § 29-39-104(a)(7).  The parties do not argue that any of the statutory exceptions apply in this case or that the district court erred in its calculations when applying the cap.

common law under the laws and constitution of North Carolina[7] at the time of the adoption of the Tennessee Constitution of 1796." *Young v. City of LaFollette*, 479 S.W.3d 785, 793 (Tenn. 2015) (internal quotation marks, alteration, and citation omitted). "Among the essentials of the right to trial by jury is the right guaranteed to every litigant in jury cases to have the facts involved tried and determined by twelve jurors." *State v. Bobo*, 814 S.W.2d 353, 356 (Tenn. 1991).

Our review of historical evidence from Tennessee and North Carolina demonstrates that punitive damages awards were part of the right to trial by jury at the time the Tennessee Constitution was adopted. The North Carolina Supreme Court discussed the issue of punitive damages in a case it decided the year after the Tennessee Constitution was drafted, *Carruthers v. Tillman*, 2 N.C. (1 Hayw.) 501 (1797). *Carruthers* was a nuisance suit in which the defendant was accused of "overflowing of the Plaintiff's land." *Id.* at 501. The Court seized the opportunity to explain the types of suits in which punitive damages (therein referred to as exemplary damages) were appropriate:

> [I]t is not proper, in the first instance, to give exemplary damages, but such only as will compensate for actual loss, as killing the timber or overflowing a field, so as to prevent a crop being made upon it, and the like. . . . [B]ut if after this the nuisance should be continued, and a new action brought, then the damages should be so exemplary as to compel an abatement of the nuisance.

*Id.* In *Rhyne v. K-Mart Corp.*, the North Carolina Supreme Court cited *Carruthers* as its first case discussing exemplary damages and as support for the established place of punitive damages in North Carolina common law. 594 S.E.2d 1, 6 (N.C. 2004). *Carruthers* fits neatly with *Wilkins v. Gilmore*, an 1840 case in which the Tennessee Supreme Court held that it was "clear" that "the jury are not restrained in their assessment of damages, to the amount of the mere pecuniary loss sustained by the plaintiff, but may award damages, in respect of the malicious conduct of the defendant, and the degree of insult with which the trespass has been attended." 21 Tenn. (2 Hum.) 140, 141 (1840). Together, *Carruthers* and *Wilkins* demonstrate that North Carolina juries were awarding punitive damages at the time the Tennessee Constitution was

---

[7]North Carolina has special relevance because the land that became Tennessee was originally part of North Carolina, and Tennessee's Constitution draws heavily from North Carolina's. *See In re Estate of Trigg*, 368 S.W.3d 483, 491 (Tenn. 2012).

drafted and that the practice continued uninterrupted in Tennessee thereafter. Accordingly, "the right to trial by jury as it existed at common law" in 1796 would have included the right to have the jury award punitive damages in appropriate cases.**[8]** *Young*, 479 S.W.3d at 793 (citations and internal quotation marks omitted).

Further review shows that the proper measure of punitive damages is historically a "finding of fact" within the exclusive province of the jury. In the 1839 case *Boyers v. Pratt*, a jury awarded the plaintiff the sizable sum of $1,460 in damages for an assault claim. 20 Tenn. (1 Hum.) 90, 90 (1839). The Tennessee Supreme Court summarized the problem of properly assessing damages as follows:

> Here there was a harmless, inoffensive young man of religious habits and a non-combatant, a stranger in a strange land, degraded by the infliction of the most ignominious punishment from the hands of a wealthy, influential and respectable citizen, and without any thing approaching to adequate cause. Who can begin to estimate, in dollars and cents, what would be an adequate compensation for such an injury?

*Id.* at 93. The Court explained that "the peace of society ought in cases of this kind always to be looked to, and damages given to such an extent as will deter persons from the commission of such offences." *Id.* It therefore concluded that it could not find the damages excessive because "[t]he question is one purely of fact, and we do not think that the jury have abused their trust." *Id.*

One hundred years later, the Tennessee Supreme Court described another punitive damages award in similar terms. In *Southeastern Greyhound Lines, Inc. v. Freels*, a passenger was refused the opportunity to board a bus; the jury awarded $500 in punitive damages even though the actual damages amounted to less than two dollars. 144 S.W.2d 743, 744 (Tenn. 1940). Based on its review of the applicable authority, the Court concluded that "the question is always for the jury, as to whether or not there was anything in the conduct of the defendant to aggravate the damages and justify the recovery therefor in addition to the actual damages

---

**[8]**Tennessee's cap on punitive damages applies by its plain terms to all "civil action[s] in which punitive damages are sought[.]" T.C.A. § 29-39-104(a). In attempting to narrow the scope of the historical inquiry about the availability of punitive damages, the dissent fails to acknowledge that the challenge in this case is to a blanket statutory cap.

suffered." *Id.* at 746. It quoted with approval an older case explaining that "punitory damages can not be claimed as a matter of right; but it is always a question for the jury, within its discretion, no matter what the facts are." *Id.* (quoting *Louisville & N.R. Co. v. Satterwhite*, 79 S.W. 106, 112 (Tenn. 1904)). Ultimately, the court concluded that it could not second-guess the jury's verdict merely because it was "unable to find strong support in this case for the allowance of additional damages." *Id.*

Following this line of cases from the Tennessee Supreme Court, we find that the General Assembly's attempt to cap punitive damages pursuant to T.C.A. § 29-39-104 constitutes an unconstitutional invasion of the right to trial by jury under the Tennessee Constitution. *See* Tenn. Const. art. I, § 6. We therefore hold that T.C.A. § 29-39-104 is unenforceable to the extent that it purports to cap punitive damage awards.

Defendant and the State ask this Court to hold otherwise for six reasons. We are not persuaded. *First*, these parties challenge the notion that the amount of punitive damages constitutes a "finding of fact." The Court recognizes that some jurisdictions do not consider punitive damage awards to be factual in nature. For example, the Indiana Supreme Court upheld a punitive damages cap in large part because "the jury's determination of the amount of punitive damages is not the sort of 'finding of fact' that implicates the right to jury trial under our state constitution." *State v. Doe*, 987 N.E.2d 1066, 1071 (Ind. 2013) (quoting *Stroud v. Lints*, 790 N.E.2d 440, 445 (Ind. 2003)). And the United States Supreme Court has explained that, "[u]nlike the measure of actual damages suffered, which presents a question of historical or predictive fact, the level of punitive damages is not really a 'fact' 'tried' by the jury." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 437 (2001) (citation omitted) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 459 (1996) (Scalia, J., dissenting)).

But as cases such as *Wilkins*, *Boyers*, and *Southeastern Greyhound* demonstrate, Tennessee law treats punitive damages differently, and it is not alone in doing so. Indeed, the United States Supreme Court acknowledged in *Cooper Industries* that there is a lack of uniformity on this issue, stating:

> Respondent argues that our decision in *Honda Motor Co. v. Oberg*, 512 U.S. 415,
> (1994), rests upon the assumption that punitive damages awards are findings of

fact.  In that case, we held that the Oregon Constitution, which prohibits the reexamination of any "fact tried by a jury," violated due process because it did not allow for any review of the constitutionality of punitive damages awards. Respondent claims that, because we considered this provision of the Oregon Constitution to cover punitive damages, we implicitly held that punitive damages are a "fact tried by a jury."  It was the Oregon Supreme Court's interpretation of that provision, however, and not our own, that compelled the treatment of punitive damages as covered.  *See Oberg*, 512 U.S. at 427; *see also Van Lom v. Schneiderman*, 210 P.2d 461, 462 (Or. 1949) (construing the Oregon Constitution).

*Id.* at 437 n.10 (citations omitted).  The Missouri Supreme Court further demonstrated this lack of uniformity when, in a recent case, it struck down a punitive damages cap on the basis that the cap invaded the province of the jury.  *See Lewellen v. Franklin*, 441 S.W.3d 136, 145 (Mo. 2014) (en banc).  In that case, the Missouri Supreme Court explained that, "[u]nder the common law as it existed at the time the Missouri Constitution was adopted, imposing punitive damages was a peculiar function of the jury."  *Id.* at 143.  Accordingly, the Court found that the punitive damages cap violated a provision of the Missouri Constitution that is materially identical to the constitutional provision at issue in this case:  "the right of trial by jury as heretofore enjoyed shall remain inviolate."  Mo. Const. art. 1, § 22(a).  Faced with this lack of uniformity, we find that the Tennessee Supreme Court would likely apply its own rule—which is shared by states like Missouri—and would find that § 29-39-104 violates the constitutional right to a trial by jury.

*Second*, Defendant and the State point out that the North Carolina Supreme Court affirmed a statutory punitive damages cap in *Rhyne*.  Given the two states' shared history, Tennessee courts have sometimes followed the lead of the North Carolina Supreme Court.  For example, in *Jernigan v. Jackson*, the Tennessee Supreme Court considered whether individuals have a right to a trial by jury in tax cases.  704 S.W.2d 308 (Tenn. 1986).  The court based its decision on a 1941 case from the North Carolina Supreme Court, explaining:

> North Carolina's constitutional provision granting trial by jury in civil cases . . . was in 1941 and is today in the same language as the original, and at no time in its history has the North Carolina Legislature authorized jury trials in tax cases.  It follows that under the law in force and use in North Carolina in 1789 and in 1796 when Tennessee's first Constitution was adopted, jury trials in tax cases were not authorized.

*Id.* at 309 (citing *Unemployment Comp. Comm'n v. J.M. Willis Barber & Beauty Shop*, 15 S.E.2d 4 (N.C. 1941)).  The court therefore adopted the North Carolina Supreme Court's holding that juries were not constitutionally required in tax cases.  *Id.*

In this case, however, we are not persuaded that the Tennessee Supreme Court would follow North Carolina's lead.  The basis for the North Carolina Supreme Court's decision in *Rhyne* was a provision of the North Carolina Constitution that protects the right to a trial by jury in "all controversies at law respecting property."  *See* 594 S.E.2d at 10 (discussing N.C. Const. art I, § 25).  Based on this language, the *Rhyne* court held that because there was "no independent right to, or 'property' interest in, an award of punitive damages," the legislature could dictate the jury's role in making such an award.  *See id.* at 13.  But the same analysis does not apply in this case because, unlike the North Carolina Constitution, the Tennessee Constitution does not contain any language limiting the right to a trial by jury to "all controversies at law respecting property."  Instead, the Tennessee Constitution broadly provides that "the right of trial by jury shall remain inviolate . . . ."  Tenn. Const. art. I, § 6.

*Third*, Defendant and the State argue that the punitive damages cap is constitutional because the Tennessee General Assembly has the power to abrogate or eliminate common law remedies.  But this argument merely begs the question because the General Assembly's power to change the common law is subject to "constitutional limits."  *Lavin v. Jordon*, 16 S.W.3d 362, 368 (Tenn. 2000) (citing *S. Ry. Co. v. Sanders*, 246 S.W.2d 65, 67 (Tenn. 1952)).  To argue that the General Assembly may cap punitive damages based on its power to modify the common law is akin to arguing that parents may drive as fast as they wish because parents make the rules.  Each argument ignores a key constraint on the rulemaker's authority.  In this case, of course, the preexisting constraint is the constitutional right to submit factual questions for determination by a jury.

The State's related discussion of *Lavin* does not persuade us otherwise.  The State cites *Lavin* as support for the proposition that "capping punitive damages was wholly within the legislature's power."  (Gov. Br. 24.)  In *Lavin*, the Tennessee Supreme Court analyzed a statute that capped a plaintiff's recovery in cases involving "injury or damage by juvenile" to "the actual damages in an amount not to exceed ten thousand dollars ($10,000) in addition to taxable court

costs." *See id.* at 365 (quoting T.C.A. §§ 37-10-101, 102). The plaintiffs' only argument was that the $10,000 cap did not apply to their case because it did not qualify as an "injury or damage by juvenile case" within the meaning of the statute and as dictated by binding precedent. *See id.* at 365, 368. In other words, the plaintiffs did not raise any constitutional challenges to the General Assembly's power to cap their recovery at $10,000. *Id.* The Tennessee Supreme Court described the statute as "distasteful" because $10,000 was "plainly inadequate and wholly insufficient to compensate the plaintiffs" for the loss of their son "to a senseless act of malicious violence . . . ." *Id.* at 369. Nevertheless, the Court could only resolve the question before it, which was a matter of statutory interpretation. In the case presently before us, however, there is no statutory interpretation issue; rather, the question is whether a punitive damages cap exceeds constitutional bounds. *Lavin* is therefore unilluminating.

*Fourth*, citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568 (1996), the State argues that "Tennessee's statutory cap on punitive damages is a way of ensuring that the level of punitive damages will meet the *Gore* due-process standard of normalization and stabilization of awards." (Gov. Br. 17.) But Tennessee's categorical punitive damages cap of "an amount equal to the greater of: (A) Two (2) times the total amount of compensatory damages awarded; or (B) Five hundred thousand dollars ($500,000)," T.C.A. § 29-39-104(a)(5), bears no relationship to *Gore*'s discussion of the federal constitutional limits on punitive damages:

> [W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. It is appropriate, therefore, to reiterate our rejection of a categorical approach. Once again, we return to what we said in *Haslip*: "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that a general concern of reasonableness properly enters into the constitutional calculus." In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis. When the ratio is a breathtaking 500 to 1, however, the award must surely raise a suspicious judicial eyebrow.

*Gore*, 517 U.S. at 582–83 (internal quotation marks, emphasis, citations, and alterations omitted).  We therefore reject this argument.

*Fifth*, the State argues that Plaintiff may not challenge the punitive damages cap because plaintiffs are never entitled to punitive damages.  Indeed, Tennessee law recognizes that punitive damages are not compensatory in nature.  *See Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 907–08 (Tenn. 1999).  But for centuries, the right to a trial by jury in Tennessee has encompassed the right to ask a jury to determine the quantity of damages that "will deter persons from the commission of such offences." *Boyers*, 20 Tenn. at 93.  A plaintiff's right to submit that "question . . . purely of fact," *id.*, to a jury is not vitiated merely because the resulting award is non-compensatory.  The district court's application of § 29-39-104 to reduce the jury's award of punitive damages undeniably reduced Plaintiff's recovery.  Therefore, Plaintiff may challenge the validity of the punitive damages cap.

*Sixth*, the State argues that the punitive damages cap merely creates "legal consequences of the jury's finding on damages."  (Gov. Br. 25.)  In other words, § 29-39-104 does not invade the province of the jury, the State argues, because it allows the jury to make the factual finding and only then is the "trial court . . . required[] to reduce the jury's assessment of punitive damages to comport with the law." (*Id.*)  Defendant similarly argues that "there is no encroachment upon the jury's fact-finding role because the jury is never aware of the cap." (Third Br. 14.)  Defendant and the State imply that § 29-39-104 is merely a regulation on the process of remittitur, but these parties do not use the word "remittitur"—perhaps because the Tennessee Supreme Court has repeatedly rejected the General Assembly's attempts to regulate the exercise of remittitur.  Indeed, the Tennessee Supreme Court has historically treated remittitur as a judicial power that may be influenced—but not controlled—by the General Assembly.  *See Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 309–10 (Tenn. 2017) (discussing history of remittitur in Tennessee); *Foster v. Amcon Int'l, Inc.*, 621 S.W.2d 142, 145 (Tenn. 1981) (rejecting "hard and fast rules in reviewing additurs and remittiturs"); *Grant v. Louisville & N.R. Co.*, 165 S.W. 963, 966 (1914) (rejecting statute that barred courts from suggesting remittitur absent a finding that award was "so excessive as to indicate passion, prejudice, corruption, . . . or . . . caprice" on the part of the jury).  The parties' attempt to recast

the General Assembly's invasion of the province of the jury as akin to a regulation of remittitur therefore fails due to an additional constitutional barrier.

The right to a trial by jury, moreover, is held by a litigant, not the jury members. In this case, the jury informed Plaintiff that Defendant's conduct so violated normal expectations of proper behavior as to entitle her to $3,000,000 in damages. The jury's ignorance of a subsequent reduction in the award does not change that infringement on Plaintiff's right. Such an infringing reduction is not analogous to permissible legal consequences that impact a jury's verdict. Statutory multipliers, for example, do not undercut a jury's assessment of damages, nor do statutes that recognize the post-verdict authority of the trial court to act as both judge and thirteenth juror. For example, Tennessee's remittitur statute allows a trial court in certain circumstances to propose "remittitur instead of granting a new trial." *Borne*, 532 S.W.3d at 310. But allowing a trial judge, after considering the attendant circumstances and proof in a case, to offer a plaintiff the choice to avoid a new trial is a far cry from legislatively reversing a jury's assessment of the amount of damages necessary to deter a defendant from future wrongful conduct.

We therefore conclude that the statutory cap on punitive damages set forth in T.C.A. § 29-39-104 violates the Tennessee Constitution.[9]

**CONCLUSION**

We therefore **AFFIRM** the district court's judgment in part, **REVERSE** in part, **VACATE** the judgment as to punitive damages, and **REMAND** with instructions for the district court to recalculate the award of punitive damages in accordance with the jury verdict and with this Court's holding that the statutory cap on punitive damages, T.C.A. § 29-39-104, is unconstitutional.

---

[9]Because we conclude that the punitive damages cap violates the constitutional right to a trial by jury, we need not address Plaintiff's alternate argument that the cap is unconstitutional as a violation of principles of separation of powers.

---

### CONCURRING IN PART AND DISSENTING IN PART

---

LARSEN, Circuit Judge, concurring in part and dissenting in part.[1]  State courts are the authority on questions of state law.  Federal courts must sometimes decide state law questions, but we are the back-ups.  We are to follow, not lead.

This case presents two uncertain and important questions of state law:  one concerning the proper construction of a Tennessee statute; the other concerning the conformity of a different Tennessee statute with the Tennessee Constitution.  The Tennessee Supreme Court has signaled its willingness to decide both of these state law questions, and we have a mechanism— certification—that allows the Tennessee Supreme Court to decide them.  I would take advantage of that mechanism to learn from Tennessee's highest court how it would interpret its statutes and its Constitution.

The majority, however, elects to decide the state law questions on its own.  It first decides that Tennessee's bad faith statute, Tenn. Code Ann. § 56-7-105(a), does not bar a plaintiff from recovering punitive damages in addition to the penalties provided in the statute.  That a prior decision of this court has held to the contrary is no obstacle—the majority overrules this court's published decision in *Heil Co. v. Evanston Insurance Co.*, 690 F.3d 722 (6th Cir. 2012), on the strength of a single, and questionable, decision of Tennessee's intermediate appellate court, *Riad v. Erie Insurance Exchange*, 436 S.W.3d 256 (Tenn. Ct. App. 2013).  *Riad* rested entirely on the assumption that a prior decision of the Tennessee Supreme Court had already decided the question that *Heil* answered.  But we know that is wrong:  The Tennessee Supreme Court has told us so.  *See Lindenberg v. Jackson Nat'l Life Ins. Co.*, No. M2015-02349-SC-R23-CV, 2016 Tenn. LEXIS 390, at *2 (Tenn. June 23, 2016) (per curiam).  Yet the majority overrules *Heil* anyway.  And with *Heil* gone, the majority proceeds to invalidate Tennessee's recently-enacted punitive damages cap, Tenn. Code Ann. § 29-39-104, because the work of the Tennessee

---

[1]I concur in Section A of the majority's opinion, which properly resolves the interpleader issue.

General Assembly is at odds with the majority's view of the jury trial right guaranteed by the Tennessee Constitution.

These two holdings are unnecessary. As to the constitutional holding, it is not even clear that Tennessee's jury trial guarantee provides the rule of decision in this federal diversity action under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). If it does not, then we have no occasion to construe the Tennessee Constitution. Putting aside the *Erie* question, the preclusive effect of Tennessee's bad faith statute and the constitutionality of the punitive damages cap are both unsettled questions on which there is no Tennessee Supreme Court authority and little (and conflicting) state law guidance. As such, both questions are ideally suited for certification. Tennessee's highest court has expressed its receptiveness to certification; the State urges certification; and neither Lindenberg nor Jackson National objects to certification.

But since the majority has declined this prudent path, I will also express my views of the merits. On both questions, I believe the majority errs. I respectfully dissent.

I.

Tennessee Supreme Court Rule 23 provides the court with discretion to accept questions certified to it by the federal courts "when the certifying court determines that . . . there are questions of [Tennessee law] which will be determinative of the cause and as to which it appears . . . there is no controlling precedent in the decisions of the Supreme Court of Tennessee." Here, we have two questions of state law on which "there is no controlling precedent in the decisions of the Supreme Court of Tennessee": (1) whether Tennessee's bad faith statute, § 56-7-105(a), provides the exclusive extracontractual remedy in a breach-of-contract case arising from an insurer's breach of an insurance contract; and (2) whether Tennessee's punitive damages cap, § 29-39-104, violates the Tennessee Constitution. Certification of both questions would, therefore, meet the "no controlling precedent" requirement of Tennessee Supreme Court Rule 23.

U.S. Supreme Court decisions also support certification when there are "[n]ovel, unsettled questions of state law." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997). The Court has stressed that certification "save[s] 'time, energy, and resources.'" *Id.* at

77 (quoting *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974)).   Most important of all, certification "helps build a cooperative judicial federalism." *Lehman Bros.*, 416 U.S. at 391. Federalism concerns are especially weighty—and certification is especially warranted—"when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." *Arizonans for Official English*, 520 U.S. at 79.   And, in a passage that feels highly relevant today, the Court called a federal court's "[s]peculation . . . about the meaning of a state statute . . . particularly gratuitous when . . . the state courts stand willing to address questions of state law on certification from a federal court." *Id.* at 79 (quotations omitted).   Here, while the majority's speculation about the meaning of a state statute results in the invalidation of state law on an equally speculative construction of the state constitution, there is no question the Tennessee Supreme Court "stand[s] willing to address" these novel issues.

One might perhaps question this willingness because the district court did certify two questions regarding the constitutionality of the punitive damages cap, and the Tennessee Supreme Court declined to review the questions.   But this ignores *why* that court did so.   The Tennessee Supreme Court refused the certified constitutional questions because the district court had failed also to certify the antecedent question concerning the preclusive effect of the bad faith statute.   Accordingly, it seems the questions certified might not have been "determinative of the cause" under Tennessee Supreme Court Rule 23.   The Tennessee Supreme Court explained:

> The jury determined that the plaintiff was entitled to both the statutory bad faith penalty pursuant to Tennessee Code Annotated section 56-7-105, and punitive damages pursuant to the common law.   The issue of the availability of the common law remedy of punitive damages in addition to the statutory remedy of the bad faith penalty is one which has not before been addressed by this Court, was not certified to this Court by the federal trial court in this case, and is not presently before this Court in this case.   It appears to this Court that it would be imprudent for it to answer the certified questions concerning the constitutionality of the statutory caps on punitive damages in this case in which the question of the availability of those damages in the first instance has not been and cannot be answered by this Court.

*Lindenberg v. Jackson Nat'l Life Ins. Co.*, No. M2015-02349-SC-R23-CV, 2016 Tenn. LEXIS 390, at *1–2 (Tenn. June 23, 2016) (per curiam).  The Tennessee Supreme Court, however, welcomed *this* court to send it *both* the statutory and the constitutional questions, noting:

> Nothing in the Court's Order is intended to suggest any predisposition by the Court with respect to the United States Court of Appeals for the Sixth Circuit's possible certification to this Court of both the question of the availability of the remedy of common law punitive damages in addition to the remedy of the statutory bad faith penalty and the question of the constitutionality of the statutory caps on punitive damages, in the event of an appeal from the final judgment in this case.

*Lindenberg*, 2016 Tenn. LEXIS 390, at *2 n.1.

I would accept this invitation; but the majority has declined.  And so I proceed to the merits.

II.

This case asks what remedies are available to an insured who believes that her insurer has, in bad faith, breached its obligation to pay on an insurance policy.  In 1901, the Tennessee General Assembly enacted the bad faith statute, Tenn. Code Ann. § 56-7-105, which provides a 25% penalty in those circumstances—i.e., "in all cases" where an insurance company refuses, in bad faith, to pay an insurance claim.  *See Leverette v. Tenn. Farmers Mut. Ins. Co.*, No. M2011-00264-COA-R3-CV, 2013 WL 817230, at *17 (Tenn. Ct. App. Mar. 4, 2013) (quoting Tenn. Code Ann. § 56-7-105(a)).  Tennessee courts have held, and repeatedly affirmed, that the bad faith statute precludes recognition of the common law tort of bad faith failure to pay an insurance claim.  *See Chandler v. Prudential Ins. Co.*, 715 S.W.2d 615, 618–21, 625 (Tenn. Ct. App. 1986); *Leverette*, 2013 WL 817230, at *17–18.  The fundamental question in this litigation is whether the bad faith statute likewise precludes a claim for punitive damages arising from a common law breach of an insurance contract—put another way, whether the statute provides the exclusive "punitive" or "extracontractual" remedy for an insurer's bad faith failure to pay.

This court has already answered, "Yes."  *See Heil Co. v. Evanston Ins. Co.*, 690 F.3d 722, 728 (6th Cir. 2012).  Lindenberg, the district court, and the majority all say, "No."  They say that Lindenberg may also recover punitive damages based on Jackson National's bad faith breach of

contract. But of course, the breach of contract in this case is the failure to pay on the insurance claim. And to get punitive damages, if they are allowed at all, Lindenberg would have to prove something more than just a breach of contract—she would have to show conduct amounting at least to "bad faith." *See Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211 n.14 (Tenn. 2012) (explaining that punitive damages are "limited to 'the most egregious cases' and [are] proper only where there is clear and convincing proof that the defendant has acted either 'intentionally, fraudulently, maliciously, or recklessly'" (citation omitted)). Jackson National argues that punitive damages should not be layered on top of the statutory bad faith penalty.

In *Heil*, this court determined that the bad faith statute precludes punitive damages for common law breach of an insurance contract. *Heil,* 690 F.3d at 728. If *Heil* remains good law, it controls this case. The majority jettisons *Heil* based on one Tennessee intermediate appellate court decision, *Riad v. Erie Insurance Exchange*, 436 S.W.3d 256 (Tenn. Ct. App. 2013). Although an intermediate state appellate decision *may* displace this court's prior interpretation of state law, this rule does not obtain when there are persuasive reasons to believe the state's highest court would disagree. *See Hampton v. United States*, 191 F.3d 695, 701–02 (6th Cir. 1999). Here there are many. *Riad*'s analysis repudiating *Heil* rested entirely on that court's shaky assumption that an earlier Tennessee Supreme Court decision, *Myint v. Allstate Insurance Co.*, 970 S.W.2d 920 (Tenn. 1998), had *already* decided that the bad faith statute does not preclude punitive damages. *See Riad*, 436 S.W.3d at 276 (criticizing *Heil* for "ignor[ing] the *Myint* progeny of cases").**[2]** But we now know that *Riad*'s assumption was wrong. The Tennessee Supreme Court has told us so: "The issue of the availability of the common law remedy of punitive damages in addition to the statutory remedy of the bad faith penalty is one which has not before been addressed by this Court . . . ." *Lindenberg*, 2016 Tenn. LEXIS 390, at *2. That eviscerates *Riad*'s analysis. But even apart from its order regarding certification, there are reasons to doubt that the Tennessee Supreme Court would adopt *Riad*'s reasoning.

To begin with, *Myint* did not directly address the question at issue in *Heil*. In *Myint*, the plaintiffs brought claims under both the bad faith statute and the Tennessee Consumer Protection

---

**[2]**I remain uncertain just which cases *Riad* was referencing as *Myint*'s supposed "progeny." *Riad* cites none; I have found none.

Act (TCPA), Tenn. Code Ann. §§ 47–18–101 *et seq.*, as well as a claim for breach of contract. 970 S.W.2d at 923. But *Myint* did not address the breach of contract claim, nor did it mention punitive damages at all. Rather, *Myint* focused on whether the TCPA applied to the insurance industry, given that the industry was already subject to Tennessee's comprehensive insurance code. *See id.* at 922 ("[T]he insur[e]r insists that the acts and practices of an insurance company are never subject to the [TCPA]."). *Myint* held that insurers were not exempt from the TCPA for two reasons. First, the court concluded, the state's insurance statutes, including the bad faith statute, "do not foreclose application of the [TCPA] to insurance companies." *Id.* at 925. Second, the court noted that the TCPA contained "crystal clear" language demonstrating that its remedies are cumulative to all others available under state law. *Id.* at 926.

Although *Myint* focused on the cumulative nature of the TCPA, *Riad* latched onto the high court's statement that it could "find nothing in either the Insurance Trade Practices Act *or the bad faith statute* which limits an insured's remedies to those provided therein." *See* 436 S.W.3d at 274 (emphasis added) (quoting *Myint*, 970 S.W.2d at 925). From this comment, *Riad* inferred that plaintiffs could recover both the statutory bad faith penalty and punitive damages for breach of contract. Although this is a facially plausible inference, other evidence casts serious doubt on whether the Tennessee Supreme Court would agree.

Pre-*Myint* cases held that the bad faith statute precludes common law claims for damages arising from an insurer's bad faith failure to pay. So *Heil*'s conclusion was not new. *Heil* based its holding on two decisions—one federal, one state—that had construed the bad faith statute as an exclusive remedy. *See Mathis v. Allstate Ins. Co.*, No. 91-5754, 1992 WL 70192, at *4 (6th Cir. Apr. 8, 1992) ("[T]he trial judge correctly noted that the 25 percent penalty provided for in [the bad faith statute] has been deemed the exclusive remedy for losses stemming from an insurer's bad faith refusal to pay a claim."); *Berry v. Home Beneficial Life Ins. Co.*, No. 1150, 1988 WL 86489, at *1 (Tenn. Ct. App. Aug. 19, 1988) ("Moreover, as to the claim for punitive damages, [the bad faith statute] is the exclusive remedy for bad faith refusal to pay claims arising from insurance policies.").

And, although we did not discuss it in *Heil*, the Tennessee Court of Appeals held, over a decade before *Myint*, that the bad faith statute precludes recognition of the common law tort of

bad faith failure to pay on an insurance policy. *See Chandler*, 715 S.W.2d at 618–21. *Chandler* is not the work of the Tennessee Supreme Court, but there is no question that its holding regarding the bad faith penalty's preclusion of the common law tort of bad faith survived *Myint*. *See Leverette*, 2013 WL 817230, at *18 ("Neither this court nor the Tennessee Supreme Court has overruled or even questioned the continuing validity of *Chandler*."); s*ee also Fred Simmons Trucking, Inc. v. U.S. Fid. & Guar. Co*., No. E2003-02892-COA-R3-CV, 2004 WL 2709262, at *3 (Tenn. Ct. App. Nov. 29, 2004) (citing *Chandler* for Tennessee rule that "there is no tort of bad faith, but an insured can seek the statutory bad faith penalty when an insurance company refuses to pay"); *Watry v. Allstate Prop. & Cas. Ins. Co.*, No. M2011–00243–COA–R3–CV, 2011 WL 6916802, at *4 (Tenn. Ct. App. Dec. 28, 2011) ("Tennessee does not recognize a general common law tort for bad faith by an insurer against an insured; the exclusive remedy for such conduct is statutory, provided by [the bad faith statute]." (quotations omitted)); *6111 Ridgeway Grp. LLC v. Phila. Indem. Ins. Co*., No. 15-2561-STA-cgc, 2016 WL 1045570, at *4 (W.D. Tenn. Mar. 15, 2016) (noting that "Tennessee courts have followed *Chandler* for thirty years"). Indeed, *Riad* itself acknowledged *Chandler*'s holding "that Tennessee did not recognize the tort of bad faith." *Riad*, 436 S.W.3d at 273. But, said *Riad*, "the court did not address the type of recovery [a] plaintiff could seek if she had brought a breach of contract action." *Id.*

I suppose this *could* be Tennessee's regime: Tennessee's bad faith statute precludes the common law tort of bad faith failure to pay on an insurance policy, per *Chandler*, and punitive damages flowing therefrom, per *Chandler* and *Leverette*, but *permits* punitive damages for the same failure to pay when that failure is cast, not as tort, but as breach of contract, per *Riad*. But *Riad*'s own reasoning would foreclose it. If *Riad* is right about the force of *Myint*'s statement— "nothing in . . . the bad faith statute . . . limits an insured's remedies to those provided therein," *Myint*, 970 S.W.2d at 925—then that should apply to the tort of bad faith as well as to a claim for punitive damages in contract. But *Chandler* expressly said otherwise, and nothing suggests that *Myint* repudiated *Chandler* in toto, or that all the post-*Myint* cases reaffirming *Chandler* are wrong. It seems far more plausible to me that *Myint* applied only to the TCPA.

No Tennessee state court decision has relied on *Riad*'s *sui generis* reading of *Myint*. One reason for this may be that the General Assembly legislatively reversed *Myint*'s holding in 2011

by enacting Tenn. Code Ann. § 56-8-113. That provision states that "title 50 and [title 56]," which include the bad faith statute, "shall provide the sole and exclusive statutory remedies and sanctions applicable to an insurer." *Id*. § 56-8-113. *Riad* acknowledged *Myint*'s abrogation in a footnote, *see* 436 S.W.3d at 274 n.3, but *Riad* did not need to address § 56-8-113 because it involved a cause of action that accrued well before 2011.[3] Here, however, the cause of action accrued after § 56-8-113's enactment, so *Myint* has limited, if any, bearing on this case.

The majority dismisses the significance of *Myint*'s abrogation because § 56-8-113 provides that "[n]othing in this section shall be construed to eliminate or otherwise affect any . . . [r]emedy, cause of action, right to relief or sanction available under common law." According to the majority, this statement "leaves intact *Myint*'s underlying conclusion" regarding the bad faith statute and so does not alter *Riad*'s holding regarding the availability of punitive damages for breach of contract. The problem with the majority's reasoning is that neither *Myint* nor any Tennessee case before *Riad* had affirmed that punitive damages *were* "available under common law" for breach of an insurance contract. As discussed above, when the General Assembly passed § 56-8-113 in 2011, all the caselaw on the subject held the opposite. And *Riad* was decided after § 56-8-113 was passed, so the General Assembly could not have contemplated, and ratified, *Riad*'s broad reading of *Myint*. Therefore, although § 56-8-113 preserved the common-law status quo, there is no indication that it preserved the availability of punitive damages in a case like this.

In sum, there are good reasons to question *Riad*'s interpretation of *Myint*: *Myint*'s focus on the TCPA, the absence of caselaw supporting *Riad*'s interpretation, the discordant *Chandler* line of cases, and *Myint*'s legislative abrogation. And all of this is reason to doubt that the Tennessee Supreme Court would agree with *Riad* and disapprove of this court's reasoning in *Heil*. But most importantly, we need not wonder whether *Myint* controls this case. The Tennessee Supreme Court has told us that *Riad* was wrong to think that it had settled matters in *Myint*: "The issue of the availability of the common law remedy of punitive damages in addition

---

[3]In light of this, some federal district courts have construed *Riad* as applying only to pre-§ 56-8-113 actions. *See Spring Place Church of God of Prophecy v. Bhd. Mut. Ins. Co.*, No. 1:13-CV-405, 2015 WL 12531988, at *4 n.4 (E.D. Tenn. Mar. 16, 2015); *Akers v. Allstate Prop. & Cas. Ins. Co.*, No. 2:14-CV-72, 2015 WL 11005023, at *5 (E.D. Tenn. Sept. 28, 2015).

to the statutory remedy of the bad faith penalty is one which has not before been addressed by [the Tennessee Supreme] Court . . . ." *Lindenberg*, 2016 Tenn. LEXIS 390, at *2. Because we thus have serious reason to doubt whether the Tennessee Supreme Court would agree with *Riad*, I would stick with our own precedent, *Heil*. I would therefore reverse the district court and vacate the punitive damages award.

III.

Deciding whether Tennessee's recently-enacted punitive damages cap comports with the Tennessee Constitution is doubly unnecessary. Certification would place the construction of the Tennessee Constitution in the hands of those entrusted with the document's safekeeping. Adhering to *Heil* would accomplish the same result. But after rejecting the Tennessee Supreme Court's assistance and our own precedent, the majority strikes down § 29-39-104 as infringing the Tennessee Constitution's jury trial guarantee. This doubly unnecessary holding is also doubly dubious: first, because it is not clear that the Tennessee Constitution's jury trial guarantee provides the rule of decision in this *federal* case; second, because any reasonable doubts about whether § 29-39-104 infringes the jury right—and there are many—require us to uphold the statute.

**A. The Unanswered *Erie* Question**

As a threshold matter, I question whether the contours of Tennessee's constitutional jury trial right are even relevant in this diversity case under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). It was not, after all, a Tennessee jury that assessed Lindenberg's claim for punitive damages. Because we are in federal court, a federal jury did that, and then a federal judge applied Tennessee's punitive damages cap to that jury verdict. "Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). Tennessee's punitive damages cap is undoubtedly *substantive*. *See id.* at 428–29. The damages cap would thus provide the rule of decision in federal court unless it were preempted by federal statutory or constitutional law or conflicted with a substantive provision of the state constitution. The question raised here is

whether an apparently *procedural* guarantee of the state constitution—the right to jury trial—can provide the rule of decision in federal court.

Lindenberg unquestionably has a Seventh Amendment right to have a *federal* jury "determine the question of liability and the extent of the injury by an assessment of damages" in her breach of contract suit. *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935). But she abandoned her Seventh Amendment challenge to the Tennessee punitive damages cap in the district court. Had Lindenberg brought such a challenge, it would have failed. Binding caselaw from this circuit rejected a Seventh Amendment challenge to Michigan's cap on medical malpractice damages on the ground that, in federal court, "the jury's role 'as factfinder [is] to determine the extent of a plaintiff's injuries,' not 'to determine the legal consequences of its factual findings.'" *Smith v. Botsford Gen. Hosp.*, 419 F.3d 513, 519 (6th Cir. 2005) (alteration in original) (quoting *Boyd v. Bulala*, 877 F.2d 1191, 1196 (4th Cir. 1989)). Other circuits addressing state damages caps under the Seventh Amendment have reached the same conclusion. *See Schmidt v. Ramsey*, 860 F.3d 1038, 1045 (8th Cir. 2017) (rejecting Seventh Amendment challenge to Nebraska's cap on medical malpractice damages), *cert. denied sub nom. S.S. ex rel. Schmidt v. Bellevue Med. Ctr. L.L.C.*, 138 S. Ct. 506 (2017); *Davis v. Omitowoju*, 883 F.2d 1155, 1165 (3d Cir. 1989) ("Where it is the legislature which has made a rational policy decision in the public interest, as contrasted with a judicial decision which affects only the parties before it, it cannot be said that [a damages cap statute] offends either the terms, the policy or the purpose of the Seventh Amendment."); *Boyd*, 877 F.2d at 1196 (rejecting Seventh Amendment challenge to Virginia's cap on medical malpractice damages). Moreover, as the majority acknowledges, the Supreme Court has held that "[u]nlike the measure of actual damages suffered . . . the level of punitive damages is not really a 'fact' 'tried' by the jury." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 437 (2001) (quoting *Gasperini*, 518 U.S. at 459 (Scalia, J., dissenting)). These cases indicate that a federal court does not violate the Seventh Amendment by applying a cap imposed by state law to limit a federal jury's award of punitive damages.[4]

---

[4]In *Jones v. United Parcel Service, Inc.*, 674 F.3d 1187, 1203 (10th Cir. 2012), the Tenth Circuit refused to apply a Kansas statute requiring the court—and not the jury—to determine the amount of punitive damages to be awarded. *Jones* affirmed "that the Seventh Amendment protects a federal plaintiff's right to have a jury determine the amount of a punitive damages award." *Id*. at 1204. But *Jones* also acknowledged that, under *Cooper*, punitive

Would a federal court violate *Tennessee's* jury trial right by applying the state's punitive damages cap to limit a *federal* jury's award of punitive damages? That Tennessee's jury trial right could be violated by capping the award of a non-Tennessee jury is certainly counterintuitive. But whether that is indeed the rule would seem to depend, at least in part, on whether the Tennessee jury trial right is substantive or procedural.

On its face, the right to trial by jury seems manifestly procedural. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010) (plurality) (characterizing a procedural rule as one that "governs only 'the manner and the means' by which the litigants' rights are 'enforced'" (quoting *Miss. Pub. Corp. v. Murphree*, 326 U.S. 438, 446 (1946))). The Supreme Court has expressly held that "the right to a jury trial in the federal courts is to be determined as a matter of *federal law* in diversity as well as other actions." *Simler v. Conner*, 372 U.S. 221, 222 (1963) (emphasis added); *see also Byrd v. Blue Ridge Rural Elec. Co-op., Inc.*, 356 U.S. 525, 535–40 (1958) (holding that plaintiff in diversity suit was entitled to jury trial even though negligence claim would have been tried by judge in state court); Fed. R. Civ. P. 38(a) ("The right of trial by jury as declared by the Seventh Amendment to the Constitution—or as provided by a federal statute—is preserved to the parties inviolate.").

Just as state law cannot shrink federal jury trial rights in federal court, *see Simler*, 372 U.S. at 222, I doubt whether state law could expand those rights. Could a litigant like Lindenberg insist on a jury trial, otherwise unavailable in federal court, on the ground that state statutory or state constitutional law required it? Although there are few cases on point, leading authorities suggest that she could not. *See* James Wm. Moore et al., 8 Moore's Federal Practice – Civil § 38.14[2] (2018) ("When . . . the state would grant a jury trial but the federal law would not, federal courts have held that federal law would also apply, and jury trial would be denied."); 9 Charles Alan Wright et al., Federal Practice and Procedure § 2303 (3d ed. 2018) ("It now also is clear that federal law determines whether there is a right to a jury trial in a case involving state

damages are not a finding of fact for the purposes of the Seventh Amendment's Reexamination Clause. *Id*. at 1205. Thus, *Jones* does not conflict with cases like *Smith*, *Boyd*, or *Schmidt*—or with the application of the damages cap in this case where the jury was allowed the opportunity to determine, in the first instance, the amount of the punitive damages award. Even if *Jones* did conflict with these cases, we would be bound by our own precedent, which has squarely decided the question. *See Smith*, 419 F.3d at 519.

law that has been brought in federal court, and that in such a circumstance, state law is wholly irrelevant."); *Gasperini*, 518 U.S. at 465 (Scalia, J., dissenting) ("[N]o one would argue that *Erie* confers a right to a jury in federal court wherever state courts would provide it; or that, were it not for the Seventh Amendment, *Erie* would require federal courts to dispense with the jury whenever state courts do so."). Before *Erie*, the Supreme Court upheld a federal court's directed verdict on contributory negligence even though the Arizona Constitution required that issue to be left to the jury. *See Herron v. S. Pac. Co.*, 283 U.S. 91, 92–94 (1931). And *Herron* seems to have survived *Erie*. *See Byrd*, 356 U.S. at 538–40 (citing *Herron*); *Hanna v. Plumer*, 380 U.S. 460, 473 (1965) (same); *see also Goar v. Compania Peruana de Vapores*, 688 F.2d 417, 423 (5th Cir. 1982) (noting that federal law "operates not only to require a jury trial when state law would deny one . . . but it also requires trial of certain issues by a judge when state law might allow a jury trial"). I thus have reservations about whether the scope of Tennessee's jury trial guarantee—a facially *procedural* right—provides the rule of decision in the dispute before us.

The majority, however, finds a substantive right—a right to unlimited punitive damages—in the state's procedural guarantee. Because this court has upheld damages caps in the face of a Seventh Amendment challenge, *see Smith,* 419 F.3d at 519, the majority's substantive right must derive from an attribute Tennessee juries do not share with their federal counterparts. The majority claims that Tennessee juries have traditionally possessed the authority to award punitive damages. But that does not seem to distinguish them from federal juries. *See, e.g.*, *Day v. Woodworth*, 54 U.S. 363, 371 (1851). The only difference the majority identifies is that, in its view, Tennessee treats punitive damages as a "'finding of fact' within the exclusive province of the jury," impervious to judicial or legislative tinkering. In the federal system, by contrast, "the level of punitive damages is not really a 'fact' 'tried' by the jury," *Cooper Indus., Inc.*, 532 U.S. at 437 (quotation omitted), and we have upheld caps on even non-punitive damages on the ground that "the jury's role 'as factfinder is to determine the extent of a plaintiff's injuries,' not 'to determine the legal consequences of its factual findings,'" *Smith*, 419 F.3d at 519 (quotation marks and alteration omitted). Tennessee law, as characterized by the majority, thus differs from federal law in its assignment of decisionmaking authority over punitive damages. But this difference would seem to be procedural, not substantive. *See Schriro v. Summerlin*, 542 U.S. 348, 353 (2004) ("Rules that allocate decisionmaking authority in this

fashion are prototypical procedural rules . . . ."). And in federal court, federal procedural rules control. *See, e.g.*, 9 Charles Alan Wright et al., *supra*, § 2303.

Still, I acknowledge that whether a state law is facially procedural may not, under the Supreme Court's *Erie* cases, be the end of the story. The Court has also applied an "'outcome-determination' test" in light of the "twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna*, 380 U.S. at 468. If the majority is right that Tennessee's procedural jury trial guarantee comprises a substantive right to unlimited punitive damages, refusing to apply that rule in federal diversity cases would be outcome-determinative as to damages and could certainly encourage forum shopping. Would that require us to apply Tennessee's procedural rule? The authorities cited above suggest that federal procedural rules would apply regardless, though there is some uncertainty over how the Supreme Court would answer the question. *See Shady Grove*, 559 U.S. at 416–17 (Stevens, J., concurring) ("[T]here are some state procedural rules that federal courts must apply in diversity cases because they function as a part of the State's definition of substantive rights and remedies."); *but see id.* at 416 (plurality) ("The short of the matter is that a Federal Rule governing procedure is valid whether or not it alters the outcome of the case in a way that induces forum shopping. To hold otherwise would be to 'disembowel either the Constitution's grant of power over federal procedure' or Congress's exercise of it." (quoting *Hanna*, 380 U.S. at 473–74)).

In sum, though I do not claim to have solved this *Erie* puzzle, I fear there may be no basis in this federal diversity action for adjudicating the constitutionality of Tennessee's punitive damages cap under Tennessee's jury trial guarantee.[5] In fairness to the majority, the parties have not briefed this issue—instead, they assumed that the scope of the Tennessee jury trial right decides this case. But before I would invalidate a state statute on the ground that it violates the

---

[5]Some federal courts *have* adjudicated challenges to state damage cap statutes based on the state constitutions' jury trial guarantees. *See Boyd*, 877 F.2d at 1195 (rejecting challenge based on Virginia Constitution's right to trial by jury); *Learmonth v. Sears, Roebuck & Co.*, 710 F.3d 249, 258–59 (5th Cir. 2013) (rejecting challenge to Mississippi damage cap predicated on Mississippi Constitution's jury guarantee after the Mississippi Supreme Court declined to resolve the question via certification). But those decisions do not explain *why* a state's jury trial guarantee should apply at all, and both upheld the challenged statutes.

state constitution, I would pause to ask whether the state constitutional question is even properly before us.

## B. The Tennessee Constitution

Addressing Lindenberg's challenge under the state constitution, the majority concedes that federal courts must be "extremely cautious about adopting 'substantive innovation' in state law," *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 578 (6th Cir. 2004) (citation omitted), and that Tennessee statutes receive "a strong presumption" of constitutionality when facing state constitutional challenges, *Lynch v. City of Jellico*, 205 S.W.3d 384, 390 (Tenn. 2006) (citation omitted). The Tennessee Supreme Court has even instructed that, "[w]hen addressing the constitutionality of a [state] statute," challenged on the ground that it violates the state jury trial right, a court must "resolve any reasonable doubt in favor of the legislative action." *Helms v. Tenn. Dep't of Safety*, 987 S.W.2d 545, 549 (Tenn. 1999). In other words, for the majority to strike down the punitive damages cap, it must prove *beyond* "any reasonable doubt" that the statute violates the Tennessee Constitution. The majority has not carried its burden.

There are ample reasons to doubt the majority's holding. First, § 29-39-104 never prevents the jury from doing what modern civil juries do: finding facts when facts are disputed. Under § 29-39-104, the jury—which is not told about the cap—still performs its factfinding function. It is only after the jury has done its job that the trial court applies state law to limit the punitive damages award. This was essentially our reason for upholding Michigan's cap on medical malpractice damages against a Seventh Amendment challenge, *see Smith*, 419 F.3d at 519, and two state supreme courts have relied on similar reasoning to uphold statutes that limit damage awards. As the Alaska Supreme Court explained, "[t]he decision to place a cap on damages awarded is a policy choice and not a re-examination of the factual question of damages determined by the jury." *Evans ex rel. Kutch v. State*, 56 P.3d 1046, 1051 (Alaska 2002). "[T]he jury has the power to determine the plaintiff's damages, but the legislature may alter the permissible recovery available under the law by placing a cap on the award available to the plaintiff." *Id.* (citation omitted). The Virginia Supreme Court made the same point in upholding a statute limiting recovery in medical malpractice actions. *See Etheridge v. Med. Ctr. Hosps.*, 376 S.E.2d 525, 529 (Va. 1989) ("Once the jury has ascertained the facts and assessed the

damages . . . the constitutional mandate is satisfied . . . [and] it is the duty of the court to apply the law to the facts." (citations omitted)).

In this case, the State's brief makes a similar argument by drawing an analogy to statutes that provide treble damages. *See, e.g.*, Tenn. Code Ann. § 47-50-109 (providing treble damages for inducing breach of contract). Under § 47-50-109, the jury first determines the plaintiff's actual damages, and then the trial court trebles the jury's finding so that the plaintiff receives the remedy required by law. *See Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 359–60 (Tenn. Ct. App. 1999). But if a statute enlarging damages set by a jury does not violate the jury right, it is hard to see why one reducing damages would do so—in a civil case, the jury right may protect defendants as much as plaintiffs. *See Caudill v. Mrs. Grissom's Salads, Inc.*, 541 S.W.2d 101, 106 (Tenn. 1976) (holding that trial judge abused its discretion by denying a jury trial where, "at the first opportunity, . . . defendants sought to exercise their constitutional right to a jury trial"). Several state supreme courts have cited the existence of damage multipliers as a reason for upholding damages caps. *See Arbino v. Johnson & Johnson*, 880 N.E.2d 420, 432 (Ohio 2007) ("We have never held that the legislative choice to *increase* a jury award as a matter of law infringes upon the right to a trial by jury; the corresponding *decrease* as a matter of law cannot logically violate that right." (emphasis in original)); *Kirkland v. Blaine Cty. Med. Ctr.*, 4 P.3d 1115, 1119–20 (Idaho 2000) (concluding that the historical existence of damage multipliers establishes that "the Framers could not have intended to prohibit in the Constitution all laws modifying jury awards" because "at the time the [Idaho] Constitution was adopted, the legislature had exercised its power to modify the common law of damages and increase the liability traditionally imposed on certain defendants").

The majority responds that damage multipliers, unlike damages caps, "do not undercut a jury's assessment of damages." This observation is true by definition. But whether a statute undercuts or augments a jury's award, such a statute interferes with the award the jury considered sufficient compensation for the plaintiff in the case of compensatory damages, or sufficient punishment for the defendant in the case of punitive damages. Here, the jury issued an award that it considered enough to punish the defendant's conduct. The majority apparently believes that the General Assembly would not violate the jury trial right by insisting that this

figure be doubled, but could not order it halved.  I cannot discern the principle underlying the majority's distinction because we know that both civil defendants and civil plaintiffs in Tennessee enjoy the protections of trial by jury.  *See Caudill*, 541 S.W.2d at 106.

The majority also, somewhat confusingly, characterizes this line of reasoning as "imply[ing] that § 29-39-104 is merely a regulation on the process of remittitur."  The majority asserts that "the Tennessee Supreme Court has repeatedly rejected the General Assembly's attempts to regulate the exercise of remittitur[,] . . . a judicial power that may be influenced—but not controlled—by the General Assembly."  But casting a punitive damages cap as remittitur misunderstands the State's and Jackson National's arguments—arguments that this court and others have found convincing.[6]

The majority gives short shrift as well to the argument that the General Assembly's power to eliminate common law rights and remedies implies the power to limit punitive damages.  This too, one would think, could create a "reasonable doubt" as to whether such a limitation violates the state's jury guarantee.  But the majority claims that "this argument merely begs the question" because the General Assembly's power is subject to "constitutional limits," so, like suggesting that "parents may drive as fast as they wish because the parents make the

---

[6]Moreover, the majority misconstrues the Tennessee cases involving remittitur.  None of the three cases cited by the majority supports its assertions about the General Assembly's power over remittitur.  *Borne v. Celadon Trucking Services, Inc.*, 532 S.W.3d 274, 309–10 (Tenn. 2017), explains that the General Assembly first enacted a remittitur statute in 1911, thereby expressly authorizing remittitur "whenever the Trial Judge is of the opinion that the verdict in favor of a party is so excessive as to indicate passion, prejudice, corruption, partiality, or unaccountable caprice on the part of the jury."  Several years later, in *Grant v. Louisville & N.R. Co.*, 165 S.W. 963, 965 (Tenn. 1914), the Tennessee Supreme Court indicated that courts could *also* suggest remittitur when a verdict was merely "excessive."  The majority characterizes *Grant* as "rejecting" the 1911 remittitur statute.  Far from it. *Grant* states that the remittitur in question "was suggested because of passion and prejudice appearing to the circuit judge, and *under the very terms of the statute* plaintiff below was entitled to accept under protest and appeal.  The Court of Civil Appeals affirmed the lower court, and this action was likewise *justified by the very terms of the statute*."  *Id*. at 966 (emphasis added).  So after suggesting that the statute did not provide the exclusive rationale for suggesting a remittitur, *Grant* did not reject the statute, it applied it.

Nor does *Foster v. Amcon International, Inc.*, 621 S.W.2d 142, 145 (Tenn. 1981), imply some constitutional rejection of "hard and fast rules in reviewing additurs and remittiturs" imposed by the General Assembly, as the majority insinuates.  In context, *Foster*'s reference to "hard and fast rules" concerns a prior decision, *Smith v. Shelton*, 569 S.W.2d 421 (Tenn. 1978), which "was written with a view to providing the appellate courts with guidelines, rather than hard and fast rules in reviewing additurs and remittiturs."  621 S.W.2d at 145. *Foster* nowhere purports to reject "hard and fast rules"—i.e., statutes—imposed by the General Assembly.  In fact, *Foster* goes on to modify the standard articulated in *Shelton* because "such an interpretation would contradict the clear language and intent of the *statute*."  *Id.* at 147 (emphasis added).  In other words, none of these cases questions the General Assembly's power to modify remittitur—if anything, they confirm that power.

rules," this "ignores a key constraint on the rulemaker's authority." But the argument here is not that the General Assembly can do whatever it wants. Rather, it is that the General Assembly's unquestioned ability to *abrogate* a common law remedy[7] suggests that the legislature could also *limit*, under some circumstances, that same remedy. The greater power generally includes the lesser.[8] So if the former does not violate Tennessee's jury right, neither might the latter. The argument at least deserves more response than the majority affords it.

Finally, I wonder whether the majority has asked the wrong question entirely: whether juries had *any* ability to award punitive damages, in any kind of case, at the time the Tennessee Constitution was adopted. As the majority concedes, the Tennessee Constitution's promise that "the right of trial by jury shall remain inviolate," Tenn. Const. art. I, § 6, does not guarantee the right to a jury trial in every case. "Rather, it guarantees the right to trial by jury *as it existed at common law* under the laws and constitution of North Carolina at the time of the adoption of the Tennessee Constitution of 1796." *Young v. City of LaFollette*, 479 S.W.3d 785, 793 (Tenn. 2015) (emphasis added) (quotation marks and alteration omitted). Therefore, the relevant question would seem to be whether, in 1796, a North Carolina jury could have awarded punitive damages *in a case like this one*—a common law breach of contract action.[9] There is serious reason to doubt that it could. As explained below, punitive damages were not available at common law for breach of contract, with only narrow exceptions, not present here.

---

[7]*See, e.g.*, *Mills v. Wong*, 155 S.W.3d 916, 922 (Tenn. 2005) ("[T]he Tennessee General Assembly has the sovereign power prospectively to limit and even to abrogate common law rights of action in tort as long as the legislation bears a rational relationship to some legitimate governmental purpose.").

[8]A better metaphor would therefore be that parents may determine *how often* their children may borrow the family car because parents determine *whether* their children may borrow the car at all.

[9]The Tennessee Supreme Court has repeatedly employed a narrow inquiry when assessing whether a state statute infringes the jury right—and it has repeatedly upheld the challenged statutes. *See Marler v. Wear*, 96 S.W. 447, 448 (Tenn. 1906) (finding no right to jury trial because "at common law no jury was impaneled *in mandamus cases*" (emphasis added)); *Jernigan v. Jackson*, 704 S.W.2d 308, 309 (Tenn. 1986) (finding no right to jury trial because "jury trials *in tax cases* were not authorized" in North Carolina in 1789 and 1796 (emphasis added)); *Newport Hous. Auth. v. Ballard*, 839 S.W.2d 86, 88 (Tenn. 1992) ("Although actions to recover possession of real property existed at common law *the particular action of unlawful detainer* resulted from the evolution of the law and did not appear in this State until passage of the first unlawful detainer statute in 1821." (emphasis added)); *Helms*, 987 S.W.2d at 548 ("Our inquiry is whether at the time of 1796, North Carolina recognized *civil forfeiture proceedings* with the right to jury trials." (emphasis added)); *Young*, 479 S.W.3d at 794 (finding no right to jury trial where statutory remedy for *retaliatory discharge* was "created long after the 1796 Constitution").

The majority looks at this case through a broader lens—asking whether punitive damages were *ever* determined by North Carolina juries in 1796.[10] It does that, perhaps, because that is the way it is used to evaluating such claims. If we were trying to decide the scope of the *federal* jury trial right, our inquiry would focus not on whether the remedy Lindenberg seeks was one "which the common law recognized among its old and settled proceedings," but on whether the remedy she seeks is legal, rather than equitable, in nature. *See Curtis v. Loether*, 415 U.S. 189, 193 (1974). Punitive damages being a "traditional form of relief offered in the courts of law," *id*. at 196, Lindenberg would have a right to have a federal jury determine them, though, as discussed above, the Seventh Amendment would not bar application of a statutory damages cap, *see Smith*, 419 F.3d at 519. And, under the Supreme Court's decision in *Curtis*, Lindenberg's right to have a federal jury determine punitive damages would apply even "to new causes of action created by" statute. 415 U.S. at 193. This is basically how the majority opinion proceeds. Because punitive damages were available in *some* kinds of cases in North Carolina in 1796, and because juries awarded those damages, the majority reasons that Lindenberg has a right to have the jury determine punitive damages (and Tennessee may not cap them).[11]

But Tennessee courts seem to apply the rule that *Curtis* rejected. Under *Helms*, when the General Assembly creates new rights or remedies—regardless of whether they are legal or equitable in nature—Tennessee's jury trial guarantee does not apply. *Helms*, 987 S.W.2d at 547. Would the Tennessee Supreme Court apply the rule in *Helms* to new *common law* remedies? *See Young*, 479 S.W.3d at 793–94 (rejecting jury trial guarantee for statutory retaliatory discharge claim and finding it significant that "even the common law tort of retaliatory discharge was only

---

[10]The majority suggests that this broader lens is fitting because Lindenberg's "challenge in this case is to a blanket statutory cap" that applies outside the breach-of-contract context. I take the majority to be suggesting that Lindenberg's challenge is facial, rather than as-applied. But assuming the facial nature of this challenge does not help Lindenberg. A facial challenge to a statute is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 525 (Tenn. 1993). And the Tennessee Supreme Court has stressed that "[t]he presumption of constitutionality applies with even greater force when a party brings a facial challenge to the validity of a statute." *Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009). So if Tennessee's punitive damages cap can be validly applied in a common law breach of contract action—or in any other context—Lindenberg's challenge necessarily fails.

[11]It is worth noting that only *one* of the North Carolina or Tennessee cases the majority relies on addresses the question at issue here: whether the legislature can limit punitive damages awards. The one case? *Rhyne v. K-Mart Corp.*, 594 S.E.2d 1, 10–14 (N.C. 2004), which affirmed North Carolina's statutory cap on punitive damages.

recognized by Tennessee courts in the 1980's"). The court does not seem to have decided this issue—another reason to certify the constitutional question rather than deciding it. But it is worth pausing to ask this question here because, although we have a common law cause of action (breach of contract) and a common law remedy (punitive damages), we have strong reason to believe that a North Carolina jury in 1796 could not have awarded punitive damages for breach of contract.

North Carolina currently adheres to the established common law rule that "punitive damages should not be awarded in a claim for breach of contract" absent an "identifiable tort" that accompanies the breach. *Shore v. Farmer*, 522 S.E.2d 73, 76–77 (N.C. 1999); Restatement (Second) of Contracts § 355 ("Punitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable."); 24 Williston on Contracts § 65:2 (4th ed.) (explaining that "exemplary or punitive damages are not generally recoverable in breach of contract actions, even where the contract is maliciously or intentionally breached"); 5 Corbin on Contracts § 1077 (1964) ("It can be laid down as a general rule punitive damages are not recoverable for breach of contract . . . ."); William S. Dodge, *The Case for Punitive Damages in Contracts*, 48 Duke L. J. 629, 630 (1999) ("Traditionally, punitive damages have not been available for breach of contract.").[12] North Carolina recognizes two traditional exceptions to this rule, allowing punitive damages for a "breach of contract to marry," *see Newton v. Standard Fire Ins. Co.*, 229 S.E.2d

---

[12]Beginning in California in the 1970s, some courts have allowed punitive damages where, as here, an insurer has refused to pay a claim in bad faith. *See* Dodge, *The Case for Punitive Damages in Contracts*, 48 Duke L. J. at 637–39; Timothy J. Sullivan, *Punitive Damages in the Law of Contract: The Reality and the Illusion of Legal Change*, 61 Minn. L. Rev. 207, 241 (1977) (discussing "line of cases, originating in California, [that] has sustained the award of punitive damages in actions originating in the alleged breach of an insurance contract"). Since then, other state high courts have followed California in expanding the availability of punitive damages— some by characterizing the breach of an insurance contract as sounding in tort. Dodge, 48 Duke L. J. at 638–42. The North Carolina Supreme Court addressed this issue in *Newton v. Standard Fire Insurance Co.*, 229 S.E.2d 297, 303 (N.C. 1976). But the court declined to decide whether it would follow the new rule because the claim was not properly alleged. *See id*. at 303–04. Nevertheless, several decisions of the North Carolina Court of Appeals allowed punitive damages for the breach of an insurance contract where "plaintiffs had sufficiently alleged a tortious act accompanied by the requisite 'element of aggravation.'" *See, e.g.*, *Von Hagel v. Blue Cross & Blue Shield of N.C.*, 370 S.E.2d 695, 698–99 (N.C. Ct. App. 1988). But these decisions constitute an application of the rule that punitive damages are permissible when a breach of contract is accompanied by an identifiable tort. They do not imply that North Carolina has abandoned its traditional approach to breach of contract claims. And of course, legal developments occurring in the 1970s and 1980s do not help us understand the purview of a North Carolina jury in 1796.

297, 301 (N.C. 1976), and "a breach of duty to serve the public by a common carrier or other public utility," *see King v. Ins. Co. of N. Am.,* 159 S.E.2d 891, 893 (N.C. 1968). Beyond these narrow exceptions, juries in North Carolina lack discretion to award punitive damages for breach of contract.

I have uncovered no evidence suggesting that North Carolina juries *ever* possessed this discretion. Early decisions of the North Carolina Supreme Court show that the state's courts have long denied juries such discretion in breach of contract actions. In an 1843 decision, the Supreme Court of North Carolina explained that a jury's ability to impose damages was strictly constrained "in matters of contract":

> It will never do in matters of contract to leave the question of damages to the *arbitrary* discretion of a jury.—There must be a rule whereby to assess them, although the application of that rule is with great propriety confided to the jury. And we know of no other that can legally be laid down, where there is no statutory provision on the subject, and the parties have not described any by the terms or nature of their contract, than that the person injured should be re-imbursed what he has lost, and if no loss be shewn by parol, should be re-imbursed to the extent of the loss which the law presumes.

*Wood v. Skinner*, 25 N.C. 564, 568 (1843) (per curiam) (emphasis in original). A breach of contract action authorized a jury to render compensatory or nominal damages—nothing more.[13] *See, e.g.*, *Richardson v. Wilmington & W.R. Co.*, 35 S.E. 235, 235–36 (N.C. 1900) ("There are many cases where an action for tort may grow out of a breach of contract, but punitive damages are never given for breach of contract (except in cases of promises to marry)."). This has long been the common law rule in England and America.[14]

---

[13]In *Wood*, the North Carolina Supreme Court acknowledged that compensatory or nominal damages might seem inadequate for particularly egregious breaches of contract. 25 N.C. at 568–69. But the court held that "these considerations are not for the court which tried the cause, nor are they for us. The constitution has provided another department of the government, to whom they may properly be addressed, and with whom they will no doubt have the weight to which they are entitled." *Id.* at 569. In other words, the North Carolina legislature could have authorized punitive damages in breach of contract actions, but juries had no inherent, or constitutional, power to award them.

[14]This country's first treatise on the law of damages supports this proposition. *See* Theodore Sedgwick, *A Treatise on the Measure of Damages* 27–28 (New York 1847); *id.* at 36 ("We shall find that in cases of contract, the law takes no notice whatever of the motives of the defaulting party; that whether the engagement be broken through inability or design, the amount of remuneration is the same . . . ."). Likewise, the earliest English treatise on damages mentions no examples of juries awarding exemplary or vindictive damages in contract cases. *See* Joseph

*Carruthers v. Tillman*, 2 N.C. (1 Hayw.) 501 (1797), on which the majority principally rests, does not suggest otherwise. *Carruthers* was a nuisance suit—not a breach of contract action. 2 N.C. at 501. The evidence thus suggests that "the right to trial by jury as it existed at common law under the laws and constitution of North Carolina at the time of the adoption of the Tennessee Constitution of 1796" did not permit juries to award punitive damages *in breach of contract actions*.[15] Would the Tennessee Supreme Court hold that legislatively capping a punitive damages award for breach of contract violates the right to trial by jury if a North Carolina jury in 1796 could not have awarded punitive damages for breach of contract at all? I do not know. But in my view, this question raises one more "reasonable doubt" that should prevent us from striking down this statute.

It is telling that the majority cites no decision of the Tennessee Supreme Court—not one—that strikes down a law for violating the state constitution's guarantee of trial by jury, though there have been many such challenges.[16] The Tennessee Supreme Court has made it very clear that, even with respect to statutes that are alleged to infringe the right to trial by jury, it "afford[s] considerable discretion to the General Assembly and resolve[s] any reasonable doubt in favor of the legislative action." *Helms*, 987 S.W.2d at 549. Because there are ample grounds for doubt, I would uphold the statute.

---

Sayer, *The Law of Damages* (London 1770). And although the amount of damages to be given was originally in the discretion of the jury, rules limiting damages for different types of contracts were becoming well-established by the end of the eighteenth century. *See* George T. Washington, *Damages in Contract at Common Law* (pt. 2), 48 L.Q. Rev. 90, 91–93 (1932) (discussing how new trial procedures and writs of inquiry led to development of concrete rules for damages in contract). To the extent there is uncertainty about the authority of colonial juries, the Tennessee Supreme Court has instructed us to resolve the uncertainty in favor of the challenged state law. *Helms*, 987 S.W.2d at 549.

[15]The parties seem to agree that modern Tennessee caselaw has diverged from the traditional rule when it comes to awarding punitive damages. *See Rogers*, 367 S.W.3d at 211 n.14. But Tennessee looks to North Carolina law to interpret its constitutional right to a jury trial, *see Helms*, 987 S.W.2d at 549, and there is no evidence that any Tennessee divergence from North Carolina on this issue occurred in 1796. Indeed, one hundred and eighty years later, Tennessee cases squarely proclaimed adherence to the "traditional" rule. *See Hutchison v. Pyburn*, 567 S.W.2d 762, 766 (Tenn. Ct. App. 1977) ("[P]unitive damages may not be recovered in an action for breach of contract."); *Johnson v. Woman's Hosp.*, 527 S.W.2d 133, 141 (Tenn. Ct. App. 1975) ("Under the contract theory of the case punitive damages are not allowable . . . .").

[16]*See Marler*, 96 S.W. at 448 (finding no constitutional right to jury trial in mandamus cases); *Jernigan*, 704 S.W.2d at 310 (finding no constitutional right to jury trial in tax cases); *Ballard*, 839 S.W.2d at 89 (finding no constitutional right to jury trial in unlawful detainer actions); *Helms*, 987 S.W.2d at 549 (finding no constitutional right to jury trial in civil forfeiture proceedings); *Young*, 479 S.W.3d at 793–94 (finding no constitutional right to jury trial in retaliatory discharge action).

\* \* \*

To close,[17] I think there are sound reasons to dispute the majority's conclusion that *Heil* no longer binds us.  And the majority's hasty invalidation of Tennessee's punitive damages cap overlooks critical issues.  Does Tennessee's constitutional jury trial right even supply the rule of decision in this case concerning a federal jury's ability to award uncapped punitive damages?  And, if so, what of the credible counterarguments the majority opinion elides?  Any reason to question the majority's opinion on this score is also a reason to certify these questions to a willing Tennessee Supreme Court.  If any federal court decision "risks friction-generating error," *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997), surely striking down a new state law on novel state-constitutional law grounds would do so.  Because the majority does so today at the expense of comity and our cooperative federalism, I respectfully dissent.

---

[17]The majority does not address Lindenberg's claim that § 29-39-104 violates principles of separation of powers under the Tennessee Constitution, so I do not address that claim either.